**TOWNS OF CONCORD, NORWOOD AND WELLESLEY, MASSACHU-SETTS, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Boston Edison Company, Intervenor. (Two cases)

Nos. 83–1446, 83–1768.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 11, 1984.

Decided March 9, 1984.

Woodrow D. Wollesen, Washington, D.C., with whom Charles F. Wheatley, Jr., Washington, D.C., was on the brief for petitioners in Nos. 83–1446 and 83–1768.

Joseph S. Davies, Washington, D.C., for respondent. Stephen R. Melton, Acting Gen. Counsel, Barbara J. Weller, Deputy Sol. and Andrea Wolfman, Attorney, F.E.R.C., Washington, D.C., were on the brief for respondent. Arlene Pianko Groner, Attorney, F.E.R.C., Washington, D.C., also entered an appearance for respondent in Nos. 83–1446 and 83–1768.

Carmen L, Gentile and James E. Hickey, Jr., Washington, D.C., were on the brief for intervenor, Boston Edison Company, in Nos. 83–1446 and 83–1768.

Before TAMM, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

In this rate controversy between Boston Edison Company (Edison) and its wholesale customers, the Towns of Concord, Norwood, and Wellesley, Massachusetts (Towns), the Federal Energy Regulatory Commission (FERC or Commission) made a policy decision: FERC determined that an electric utility could immediately commence collecting from ratepayers contributions to costs the utility would eventually pay for

permanent disposal of spent nuclear fuel—nuclear fuel the utility "burned" to generate the electric service supplied to current customers. *Boston Edison Co.*, 21 FERC (CCH) ¶ 61,327 (Dec. 23, 1982) [hereafter, *Commission Decision*]; *Boston Edison Co.*, 22 FERC (CCH) ¶ 61,212 (Feb. 23, 1983) (Order Denying Rehearing); *Boston Edison Co.*, 23 FERC (CCH) ¶ 61,176 (May 5, 1983) (Order Denying Motion for Reconsideration); *Boston Edison Co.*, 23 FERC (CCH) ¶ 61,410 (June 22, 1983) (Order Denying Rehearing and Terminating Docket). Petitioning for review, Towns maintain that the Commission lacked authority to permit current collection of estimated future costs of spent nuclear fuel disposal.[1]

Towns assert in their review requests that, prior to the passage of the Nuclear Waste Policy Act of 1982, 42 U.S.C.A. §§ 10101–10226 (West 1983), spent nuclear fuel disposal costs were too distant and uncertain to be included in current rates. With the Act in force, Towns contend, Commission-estimated disposal costs are impermissible; instead, Towns maintain, FERC's authorization of any collection from ratepayers had to await the Secretary of Energy's determination of the precise amounts Edison is to pay for eventual government disposal of the utility's spent fuel.

■ We hold that the Commission did not exceed its authority, and that it acted reasonably, in permitting Edison to start charging ratepayers a fairly and conservatively estimated amount for the eventual permanent disposal of nuclear fuel used to generate power current ratepayers receive. Accordingly, we deny the petitions for review and affirm the Commission's orders.

1. Edison filed the increased rate in question July 2, 1980. Thereafter, the parties settled all issues except those involving costs associated with disposal of spent fuel used in the generation of electricity at Edison's Pilgrim I nuclear plant. On January 1, 1983, the rates at issue in this case were superseded by new rates. *See Boston Edison Co.*, 25 FERC (CCH) ¶ 61,058 (July 8, 1983).

I. BACKGROUND

In *Minnesota v. NRC*, 602 F.2d 412, 413 (D.C.Cir.1979), this court described how nuclear fuel becomes "spent" in the process of power generation:

A nuclear reactor core contains a number of fuel assemblies, bundles of thin tubes (or "fuel rods") containing pellets of enriched uranium. The buildup of neutron-absorbing "poisons" during the chain reaction reduces the ability of the fuel to sustain an efficient chain reaction. "Spent" fuel assemblies must therefore be removed periodically from the reactor core and replaced with fresh fuel. When removed from the core, the assemblies generate enormous heat and contain highly radioactive uranium, actinides and plutonium. Under current practice, the assemblies are placed vertically on racks in a "spent fuel pool" adjacent to the reactor and within the containment vessel. The spent fuel pool is a large basin constructed of concrete, lined with stainless steel and filled with water to dissipate the heat generated by radioactive decay and to absorb radiation.

*See also Carolina Power & Light Co. v. FERC*, 716 F.2d 52, 53 (D.C.Cir.1983). Operators of nuclear generating facilities initially believed that their spent nuclear fuel would eventually be reprocessed to extract useable fissionable material for fabrication into fresh fuel assemblies. Temporarily stored spent fuel was therefore treated as an asset by electric utilities. *See id.* In time, however, it became apparent that prospects for reprocessing accumulated spent nuclear fuel were not high,[2] and that even if reprocessing occurred, high level radioactive waste would remain and require eventual permanent disposal. *Commission Decision*, 21 FERC at 61,879–80;

2. No reprocessing plants are currently operative in the United States. Three commercial plants constructed in the 1960s and early 1970s to reprocess spent nuclear fuel have been abandoned. Even if government efforts to rekindle interest in commercial reprocessing succeed, it is questionable whether current backlogs of spent fuel discharges will ever be reprocessed. *See Boston Edison Co.*, 18 FERC (CCH) ¶ 63,059, at 65,175–76 (Mar. 5, 1982).

*Boston Edison Co.*, 18 FERC (CCH) ¶ 63,-059, at 65,171, 65,174–77 (Mar. 5, 1982) [hereafter, *ALJ Initial Decision*].

FERC initially responded tentatively and insecurely to changing expectations regarding the reprocessing value, or the lack thereof, of accumulated spent nuclear fuel. In the Commission's first encounter with the issue, *Virginia Electric & Power Co. (VEPCO)*, 15 FERC (CCH) ¶ 61,052 (Apr. 10, 1981) [hereafter, *VEPCO* ], FERC stated:

> [I]t is important that VEPCO begin to collect from its current consumers, who are benefiting from nuclear generation, at least a share of the costs which eventually will be incurred in disposing of spent nuclear fuel[, for] it would not be equitable to permit this contingent liability to continue to accumulate unfunded as a burden on future electric consumers. . . .

*Id.* at 61,105. Due to the then existing uncertainty concerning the likelihood of reprocessing, however, the Commission refused to permit any immediate recovery for permanent disposal costs; instead, it allowed VEPCO to pass on as a current cost of service only the charge VEPCO associated with interim storage of spent nuclear fuel. *Id.*

Next, in *Carolina Power & Light Co.*, 17 FERC (CCH) ¶ 61,118 (Nov. 5, 1981) [hereafter, *Carolina Power* ], FERC allowed Carolina Power (as it had previously allowed VEPCO) to remove from the rate base and amortize the positive salvage value the Company had assigned to spent nuclear fuel when the utility anticipated economical reprocessing. *See Carolina Power*, 17 FERC at 61,238; *VEPCO*, 15 FERC at 61,104. But again, the Commission refused to permit any current charge for eventual permanent disposal. The Administrative Law Judge had granted Carolina Power's request to commence recovery of disposal costs. *Carolina Power & Light Co.*, 9 FERC (CCH) ¶ 63,060 (Dec. 26, 1979). Disagreeing with that initial decision, FERC concluded that the utility had not adequately demonstrated that its spent fuel was destined for disposal. *Carolina Power*, 17 FERC at 61,238–39. The Commission observed, however, that nothing prevented Carolina Power from renewing its request, in a subsequent rate filing, at which time the utility might present evidence sufficient to "justify the pass-through of . . . costs associated with spent nuclear fuel disposal." *Id.* at 61,239.

Three days before denying rehearing in *Carolina Power*, FERC decided the instant case. Based on a record FERC found more impressive than the one in *Carolina Power*, the Commission allowed Edison to include in current rates a charge for permanent disposal of spent nuclear fuel. With FERC's decision in favor of Edison's charge in full view, we remanded *Carolina Power* to the Commission for closer consideration. *Carolina Power & Light Co. v. FERC*, 716 F.2d at 56. We stressed that in *Carolina Power*, the Commission had neglected to address in its opinion diminished prospects for reprocessing the utility's temporarily stored spent fuel in light of record evidence "of the tremendous backlog of spent nuclear fuel already accumulated by nuclear generating facilities across the country." *Id.*[3]

In defending the permission granted Edison, FERC now acknowledges that it has

---

**3.** FERC has yet to act on remand in *Carolina Power*. In Delmarva Power & Light Co., 24 FERC (CCH) ¶ 61,199 (Aug. 1, 1983) [hereafter, *Delmarva Power* ], however, the Commission followed the precedent it set in the instant case and allowed Delmarva to assess a current charge for the eventual permanent disposal of nuclear fuel currently used to generate power. Relying simply on citation to its *Boston Edison* opinion, the Commission reaffirmed its position that "costs will be incurred for [spent nuclear fuel] disposal"; thus, "it is important to begin to collect from current customers . . . at least a share of the [permanent disposal costs] of the spent nuclear fuel which has been used for their benefit." *Delmarva Power*, 24 FERC at 61,640. Delmarva's allowable charge was set at an amount equal to the fee established by the Nuclear Waste Policy Act of 1982, 42 U.S.C.A. §§ 10101–10226 (West 1983), for federal disposal of spent nuclear fuel burned after April 6, 1983. *Id. See infra* pp. 827–828 & n. 5 (describing NWPA disposal charges).

made a policy decision. *See* Brief for Respondent FERC at 1 [hereafter, FERC Brief]. Aided by the clear exposition the Administrative Law Judge presented, *see ALJ Initial Decision,* 18 FERC at 65,174–77, the Commission recognizes that (1) reprocessing currently stored spent fuel is uncertain ever to occur, and (2) in the event that backlogged fuel is reached for reprocessing at some distant date,[4] remaining high-level radioactive wastes will require disposal. *Commission Decision,* 21 FERC at 61,880; FERC Brief at 11.

FERC's principal decision in this case issued December 23, 1982. On January 7, 1983, the Nuclear Waste Policy Act, 42 U.S.C.A. §§ 10101–10226 (West 1983) (NWPA or Act), became effective. That Act removed all doubt, if any remained, that utilities with nuclear plants would in fact incur disposal costs for fuel used to provide service to current customers. Moreover, under the NWPA, payment for

eventual disposal is neither distant in time nor uncertain in amount.

The NWPA, superintended by the Department of Energy (DOE), provides for government disposal of spent fuel (or high-level radioactive waste derived therefrom) commencing not later than January 31, 1998. *See* 42 U.S.C.A. § 10222(a)(5)(B) (West 1983). Contracts for this government service cover two types of charges. *Id.* § 10222(a)(2)–(3). Quarterly payments are to be collected by DOE for disposal of fuel used to generate electricity after April 6, 1983. *Id.* § 10222(a)(2); 48 Fed.Reg. 16,-603 (1983) (to be codified at 10 C.F.R. § 961.11 (art. VIII, sec. B.1 of standard contract)).[5] For fuel used prior to April 7, 1983, DOE is to collect a one-time charge. 42 U.S.C.A. § 10222(a)(3) (West 1983). The precise amount of the one-time charge depends on the irradiation levels of the utility's discharged fuel. 48 Fed.Reg. 16,602 (1983) (to be codified at 10 C.F.R. § 961.11 (art. VIII, sec. A.2 of standard contract)).[6]

---

**4.** No reprocessing plant was under construction or even projected by investors in 1982 when the Administrative Law Judge rendered the initial decision in this case. Construction and NRC licensing, should investors resolve to commit the $500 million to $1 billion necessary to build a plant, would probably span nine to thirteen years. *See Commission Decision,* 21 FERC at 61,879, 61,882 nn. 6 & 7; *ALJ Initial Decision,* 18 FERC at 65,175–76. Even if a reprocessing plant the size of the largest of the three commercial plants previously in construction, *see supra* note 2, comes on line as early as 1992, the current estimate cited by FERC is that the plant could process in that year only 38% of all the spent fuel generated in 1992 alone. If the plant proceeded initially to process only the backlog, the current estimate cited by FERC is that fuel accumulated before 1992 would entirely occupy the plant's reprocessing facilities until 2015. *See Commission Decision,* 21 FERC at 61,879; *ALJ Initial Decision,* 18 FERC at 65,176.

**5.** Congress prescribed a fee equal to 1.0 mil per kilowatt-hour of electricity generated. 42 U.S.C.A. § 10222(a)(2) (West 1983). This charge is approximately equal to $168 per kilogram of heavy metal (Kg.HM) in spent nuclear fuel, *Delmarva Power,* 24 FERC at 61,460, although the precise per kilogram rate will vary from utility to utility, depending on the operational characteristics of each nuclear plant. FERC Brief at 19 n. 5. If the statutory rate generates insufficient or excess revenue relative to actual permanent disposal costs, DOE may prescribe adjust-

ments. 42 U.S.C.A. § 10222(a)(4) (West 1983); *see* 48 Fed.Reg. 16,602 (1983) (to be codified at 10 C.F.R. § 961.11 (art. VIII, sec. A.4 of standard contract)) (DOE will conduct annual review of fee and make prospective adjustments).

Utilities operating a nuclear power plant prior to April 7, 1983, were effectively required to enter into contracts with DOE by June 30, 1983. *See infra* note 8. The fee for electricity generated from April 7 to June 30 was due by July 31, 1983. After that initial quarter, regular periodic payments commence. *See* 48 Fed.Reg. 16,603 (1983) (to be codified at 10 C.F.R. § 961.11 (art. VIII, sec. B.1 of standard contract)).

**6.** Congress instructed DOE to set the one-time fee at a charge per Kg.HM in the spent fuel (or in the solidified high-level radioactive waste derived therefrom) equivalent to an average fee of 1.0 mil per kilowatt-hour of electricity generated from that fuel (the same per kilowatt-hour fee Congress prescribed for fuel burned after April 6, 1983, *see supra* note 5). 42 U.S.C.A. § 10222(a)(3) (West 1983). To carry out this statutory instruction, DOE established four separate per Kg.HM charges, each ascending charge to apply to spent fuel that previously generated an ascending range of electricity. These charges vary from a low of $80.00 per Kg.HM (for spent fuel that generated between zero and 5,000 megawatt-days (thermal) per metric-ton of uranium) to a high of $184.00 per Kg.HM (for spent fuel that generated over 20,-000 megawatt-days (thermal) per metric-ton of

To avoid substantial interest accruals,[7] a utility must pay its one-time fee within two years of executing a disposal contract with DOE. *Id.* at 16,603.[8]

Towns press three objections to FERC's decision allowing a spent nuclear fuel disposal cost recovery in Edison's rates. Prior to the enactment of the NWPA, Towns assert, disposal costs were too distant and speculative to be taken into account in setting current rates. Towns further maintain that they are unfairly saddled with a charge wholesale customers served by other utilities are not paying. FERC should not have responded to Edison's request in isolation, Towns complain; instead, the Commission should have undertaken a rulemaking. Finally, Towns contend that, upon the enactment of the NWPA, FERC lost whatever authority it may have had to allow spent fuel disposal cost recovery based on estimations. Until DOE determined the precise dollar figures per kilogram for each utility, Towns argue, FERC had to defer any allowance for disposal costs. We explain below why we reject each of Town's objections.

## II. Discussion

Edison has been charging its wholesale customers for spent nuclear fuel disposal costs since July 1980,[9] although the utility did not expect disposal to occur until 1997 at the earliest. *ALJ Initial Decision,* 18

FERC at 65,172. The Administrative Law Judge, and later FERC, recognized the appropriateness of Edison's collection, if disposal costs could be estimated reasonably, based on the regulatory principle that "customers ... who receive the benefits of service should pay their fair share of the costs associated with delivering that service." *Id.*

Nuclear fuel used at Edison's Pilgrim I plant generates the electric service currently provided to Towns. Fuel so "spent," because of its radioactive, lethal nature, cannot be stored on-site indefinitely. Ultimately, it must be transported for permanent disposal, *see id.* at 65,171, and it is now certain that the government will undertake provision of geologic repositories for such disposal, imposing fees for this service. *See supra* pp. 727–728. The Administrative Law Judge emphasized that

> [i]f [disposal] costs are not currently recouped [from current] customers they will remain as a burden on future customers and ratepayers who will have to pay [for] disposing of the nuclear fuel which was never used for their benefit. Such intergenerational cross-subsidization and inequity should be avoided if rationally and legally possible.

*ALJ Initial Decision,* 18 FERC at 65,172. He cited as FERC precedent most closely in point, *Connecticut Light & Power Co.,* 13 FERC ¶ 61,155 (Nov. 21, 1980),[10] involv-

uranium). 48 Fed.Reg. 16,602 (1983) (to be codified at 10 C.F.R. § 961.11 (art. VIII, sec. A.2 of standard contract)); *see id.* at 16,593.

7. Within two years of contract execution, a utility must select one of three payment options. First, the utility may pay the one-time disposal fee in full within two years of executing the contract (or by June 30, 1985, whichever is later). Under this option, no interest is due. Second, the utility may make a single lump sum payment any time prior to the scheduled first delivery of spent fuel to DOE. Under this option, interest accrues from April 7, 1983, until payment at a rate initially equal to the first 13-week Treasury bill rate issued after April 7, 1983, and compounded in each succeeding quarter by the corresponding 13-week Treasury bill rate. Third, the utility may pay in quarterly installments over 10 years. Under this option, interest accrues on the fee (at the same rate as

under the second option) from April 7, 1983, until payment begins. Once payment begins, each quarterly payment must include interest on the outstanding balance (both principal and prepayment interest) at a rate equal to the 10-year Treasury bill rate in effect on the date of the first payment. 48 Fed.Reg. 16,603 (1983) (to be codified at 10 C.F.R. § 961.11 (art. VIII, sec. B.2 of standard contract)).

8. A utility had to sign a contract with DOE by June 30, 1983, in order to avail itself of government disposal services for fuel used to generate electricity before April 7, 1983. *See* 42 U.S.C.A. § 10222(b)(2) (West 1983).

9. *See supra* note 1.

10. *Accord* Connecticut Yankee Atomic Power Co., 10 FERC (CCH) ¶ 63,018, at 65,100–07 (Jan. 23, 1983) (utility may recover currently a share

ing the decommissioning of a nuclear plant at the end of its useful life, which might not occur for 35–40 years. In that case, the Commission authorized recoupment of a fair share of the inevitable, yet not fully quantifiable, decommissioning costs from the current generation of ratepayers who benefited from operation of the plant. *Id.*, at 61,332.

The record evidence, carefully reviewed by the Administrative Law Judge, *ALJ Initial Decision*, 18 FERC at 65,174–77, strongly supported Edison's claim, summed up in the testimony of Michael J. Lawrence, DOE's Acting Director of the Office of Nuclear Fuel Cycle, Nuclear Waste Management and Fuel Cycle Programs, Office of Nuclear Energy:

> [W]e know with almost absolute certainty [that] at some point in time radioactive waste must be permanently disposed of. That will cost money.

*Id.* at 65,176. Towns' presentation to us does not seriously dispute that disposal will someday be required or that it will cost money. Instead, Towns now stress the distant time (late 1990s) projected for permanent disposal and the lack of prior experience against which disposal cost estimates could have been measured in 1980 to determine their reasonableness. Essentially, they attack estimation of spent fuel disposal costs as too much guesswork to be

tolerated under the Federal Power Act's just and reasonable ratemaking standard. *See* 16 U.S.C. § 824d(a) (1982).

Edison charged Towns at the rate of $148 per kilogram of heavy metal (Kg.HM) in Pilgrim I's spent fuel assemblies.[11] It derived this charge from projections made in a 1978 DOE report, which developed a cost range of $112 to $214/Kg.HM for permanent disposal (in 1978 dollars). *ALJ Initial Decision*, 18 FERC at 65,173. Edison used DOE's lowest estimate, $112/Kg.HM, and added $15/Kg.HM for transportation from its on-site storage pool to the projected federal geologic depository, yielding a total of $127/Kg.HM in 1978 dollars. Adjusting for 1978 to 1980 inflation, Edison arrived at the $148/Kg.HM figure. *Id.*

DOE issued a further report in 1980 projecting permanent disposal costs, in 1980 dollars, as $234/Kg.HM. *Id.*[12] Observing that Edison's charge fell well below DOE's projections, and that Towns attacked the existence, but not the level, of the charge, *id.*, the Administrative Law Judge concluded that the $148/Kg.HM allowance Edison sought was "fair and reasonable" and "justified for permanent disposal." *Id.*[13]

FERC reviewed DOE's projections of costs associated with disposal of spent nuclear fuel, as well as evidence showing "the dramatic increases in the cost of bringing a reprocessing plant on-line, the cost of stor-

---

of costs of decommissioning nuclear plant at least 20 years in future based on estimates of least expensive method of decommissioning), *aff'd*, 13 FERC ¶ 61,154 (Nov. 21, 1980) (Commission opinion); *see* Columbia Gulf Transmission Co., 13 FERC ¶ 61,211 (Dec. 12, 1980) (accepting principle, not contested by the parties, that pipeline company can recover currently a fair share of eventual cost of dismantling offshore facilities).

**11.** The Administrative Law Judge recognized the appropriateness of "some method of discounting" since Edison will have been collecting from its customers years before it pays for disposal. Although he rejected Towns' suggested discounting technique, he observed that Edison "is, in effect, employing a method of discounting since its $148/kg charge is far below [the charge] projected by DOE [in 1980 dollars] for permanent disposal." Also noteworthy in this regard, the Administrative Law Judge observed

that "the Company is reducing rate base by the amount of the accumulated [spent nuclear fuel disposal cost] fund," thereby "passing on to the ratepayers the time value of their ... payments." *ALJ Initial Decision*, 18 FERC at 65,-178–79.

**12.** It now appears that DOE's one-time NWPA charge to Edison for disposal of fuel "spent" prior to April 7, 1983—the only fuel at issue in this case, *see infra* note 1—will be $162/Kg.HM. *See* FERC Brief 19 & n. 7; *see also supra* note 6.

**13.** The charge at issue, included in Edison's July 1980 rate filing, *see supra* note 1, covers the permanent disposal cost of (1) uranium placed in the reactor in May 1980, a cost to be amortized over the fuel's projected five-year period of burn; and (2) the accumulation of fuel "spent" before May 1980, a cost to be amortized over an approximately 17-year period. *See ALJ Initial Decision*, 18 FERC at 65,179.

ing left-over radioactive waste, the ever-growing backlog of [spent fuel], and decreases in the market price of uranium." *Commission Decision*, 21 FERC at 61,880. In the Commission's view, the evidence solidly established that "Edison will necessarily incur future costs of at least $148/kg." *Id.*

Towns no longer urge a number of the points the Administrative Law Judge appraised as meritless, *see ALJ Initial Decision*, 18 FERC at 65,173–74, but they continue to insist that estimation of disposal costs is rudderless and alien to FERC's customary cost-of-service methodology. Departures from the "actual costs incurred principle," Towns argue, should be sanctioned only when supported by "past experience with the same expense." Brief of Petitioners at 9, 11 [hereafter, Towns Brief]; *see id.* at 13.

FERC ruled on a matter that "will cost money," *see supra* p. 828, and did not reply on estimations plucked from thin air. It rested on the reports and projections of DOE, the very agency that will offer government disposal service to utilities. *See ALJ Initial Decision*, 18 FERC at 65,-181 n. 7. Towns tender no persuasive reason why even the lowest estimate DOE made was so infirm that FERC should not have attempted in the matter at hand any avoidance of intergenerational cross-subsidization and inequity.

Towns urged before the Commission and repeated in court that they have been singled out unfairly for imposition of a novel cost of service not yet imposed on customers of other utilities. Reply Brief at 3, 5, 12. They acknowledge that FERC is not tied by statute to "any particular methodology of ratemaking," *id.* at 5, but they assert that a rulemaking is the only equitable format for the change at issue. *See id.* at 3. In essence, Towns ask, "why me?".

The Administrative Law Judge considered rulemaking "desirable in the interest of efficiency and economy both for the Commission and the industry since the [spent nuclear fuel disposal cost] problem is common to all electric utilities which operate nuclear generating facilities." *ALJ Initial Decision*, 18 FERC at 65,174. He recognized, however, the Commission's consistent view that case-by-case consideration was the preferable course while the issue of spent fuel disposal remained subject to "a variety of constantly changing [political, economic, and technological] factors." *Commission Decision*, 21 FERC at 61,882; *see ALJ Initial Decision*, 18 FERC at 65,174.

This court remanded one Commission adjudication on spent nuclear fuel collection because FERC's reasoning slipped from the grasp so that a reviewing tribunal could not comprehend why the agency had reached different decisions in apparently like cases. *Carolina Power & Light Co. v. FERC*, 716 F.2d at 55–56. That problem is not present here. The Administrative Law Judge's decision, which the Commission adopted in pertinent part, is well-reasoned and has a solid evidentiary underpinning.

■ The Commission has broad discretion to evolve a policy position on a rate-making issue in an adjudicatory format or by rulemaking. *See, e.g., SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947); *Alabama-Tennessee Natural Gas Co. v. FPC*, 359 F.2d 318, 343 (5th Cir.1966). Although Towns' criticism is not insubstantial, FERC's decision to proceed by adjudication in this case remains within the wide zone of Commission discretion.[14]

The enactment of the NWPA has led Towns to shift their ultimate argument. Towns opened with the complaint that, absent any past experience with the expense in question, a reasonable charge to current

---

14. As represented in its brief, *see* FERC Brief at 1, the Commission reached a policy decision in this case which it now appears to apply even-handedly. *See supra* note 3 (noting Commission's decision in *Delmarva Power*); *see also*

Ohio Edison Co., 24 FERC (CCH) ¶ 63,068, at 65,122–23 (Aug. 23, 1983) (ALJ opinion) (in light of *Boston Edison* opinion, current recovery of eventual permanent disposal costs of spent nuclear fuel is authorized).

customers for distant disposal costs was impossible to gauge. *See* Towns Brief at 11–12. Towns in the end maintain that Congress, through the NWPA, has provided a very certain gauge—the charges Edison must pay DOE for eventual government disposal of the utility's spent fuel. The Act implicitly "precludes the Commission from establishing allowances for [disposal costs] on an *ad hoc* basis," Towns argue, Towns Brief at 5; the NWPA "preempts the field," and FERC must "follow its lead." Reply Brief at 8; Joint Appendix at 316 (Towns' Motion for Reconsideration, filed April 8, 1983). Towns first tendered the argument that the NWPA "eliminates Commission jurisdiction to estimate [disposal costs]"[15] in a motion for FERC reconsideration. We agree with the Commission that Towns read more into the NWPA than Congress put there.[16]

Towns did not claim before the Commission, and they do not now urge, that Edison's charge is excessive in view of NWPA-prescribed fees. In permitting the charge, FERC stated that in future proceedings it would "adjust rates" and "fine-tune its treatment" when armed with "updated information." *Commission Decision*, 21 FERC at 61,882. The NWPA has facilitated such adjustments.

FERC did not find in the Act's silences, nor do we, a retroactive ouster of "any authority the Commission previously had to estimate [disposal costs]." *See* Towns Brief at 14, 15. Instead, the Commission sensibly anticipated adjusting charges of the kind involved here "in accordance with the new legislation." *Boston Edison Co.*, 23 FERC (CCH) ¶ 61,176, at 61,383 (May 5, 1983) (Order Denying Motion for Reconsideration). But the greater certainty the Act now brings to FERC's judgments does not mark as unauthorized or "arbitrary and capricious" the conservative estimate made in this case with the best guides available to the Commission before the NWPA became law, an estimate later checked against the Act and found, with no contra-

diction by Towns, "within the amount provided under the NWPA." *Id.*

For the reasons stated, the petitions for review are denied and the Commission's orders are affirmed.

*It is so ordered.*

---

**15.** Reply Brief at 12.

**16.** The Act makes no reference at all to FERC or utility ratemaking authority.