**AMERICAN CETACEAN SOCIETY, et al., Plaintiffs,**

v.

**Malcolm BALDRIDGE, et al., Defendants,**

**and**

**The Japanese Whaling Association & The Japanese Fishing Association, Defendant-Intervenors.**

**Civ. A. No. 84–3414.**

United States District Court, District of Columbia.

Decided March 5, 1985.

William D. Rogers, James A. Beat and John F. Libby of Arnold & Porter, Washington, D.C., for plaintiffs.

F. Henry Habicht, II, Asst. Atty. Gen., Donald A. Carr and Dianne H. Kelly, U.S. Dept. of Justice, Peter H. Flournoy, of counsel, U.S. Dept. of State, and Robert McManus, Gen. Counsel, National Oceanic and Atmospheric Admin., Dept. of Commerce, Washington, D.C., for defendants.

Scott C. Whitney and Steven R. Perles, Washington, D.C., for defendant-intervenors.

CHARLES R. RICHEY, District Judge.

This action is before the Court on Cross-Motions for Summary Judgment, as well as a Motion to Dismiss for failure to state a claim upon which relief can be granted. The numerous plaintiffs in this case are all

wildlife conservation groups which share a common dedication to preserving and protecting endangered species. The defendants are Secretary of Commerce Malcolm Baldridge and Secretary of State George Schultz, both being sued in their official capacity. In addition, the Japanese Whaling Association and Japanese Fisheries Association (hereinafter "JWA/JFA") have been allowed into this action as defendant/intervenors.

Plaintiffs contend that Secretary Baldridge violated a clear non-discretionary duty when he failed to certify to the President that Japanese nationals were engaged in sperm whaling in violation of the International Whaling Commission's (hereinafter "IWC") zero sperm whale quota for the 1984–85 season. Plaintiffs seek a declaratory judgment from this Court that such failure to certify was in violation of the Packwood-Magnuson Amendment to the Magnuson Fishery Conservation and Management Act of 1976. 16 U.S.C. §§ 1821(e)(2)(A)(i) and (B). Plaintiffs also request that the Court declare and adjudge that such whaling activities by any nation in excess of the IWC quota is necessarily an activity which "diminishes the effectiveness" of the International Convention for the Regulation of Whaling (hereinafter "the Convention"), the multi-lateral treaty which the IWC oversees.

Additionally, plaintiffs seek a permanent injunction from this Court enjoining both Secretaries Baldrige and Schultz, and their subordinates, from agreeing not to certify, and from failing to certify, any whaling activities by nationals of Japan that violate IWC whaling quotas, and from agreeing not to reduce, and from failing to reduce, Japanese fishing quotas in consequence of such certification.

The defendants argue that Secretary Baldridge's actions which give rise to this suit were within the scope of his discretion to determine what activities diminished the effectiveness of the Convention, and that his decision not to certify was actually designed to insure its continued effectiveness. Therefore, the defendants argue, the Packwood-Magnuson automatic sanction was never triggered. The JWA/JFA argue

that the Japanese were never technically in violation of the Convention, and, therefore, the Japanese cannot be certified. In addition, they raise other arguments dealing with what they perceive as irregularities under the Administrative Procedure Act 5 U.S.C. § 551, *et seq.* They have also filed a motion to dismiss the complaint under Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. In this motion, the intervenors argue that plaintiffs fail to meet the appropriate standard for a permanent injunction in the nature of mandamus and that therefore the complaint cannot stand.

For the reasons set forth below, the Court denies the Motion to Dismiss, and grants the Plaintiffs' Motion for Summary Judgment.

## FACTUAL AND STATUTORY BACKGROUND

For the past thirty five years, the international whaling industry has brought about the systematic devastation of the major whaling populations on this planet. Although a central focus of many cultures over the past centuries, whaling has gone beyond cultural identity and into the realm of international business. The whale was originally hunted for its oil, its ivory teeth and its meat. It was hunted in small numbers, as the technology of the early whalers limited their ability to catch more than a few whales each season. This has changed drastically, however, since the end of World War II. Improvements in technology, such as larger and stronger whaling ships and explosive harpoons, made whaling as big business both practical and profitable. New uses for whale products began to be discovered. The whale oil, once used for heat and light, is now used as a high-grade industrial lubricant. The meat, only rarely used for human consumption, is a major ingrediant in pet food and agricultural feed. The whalers, unrestrained by any regulations regarding their activities, took as many whales as they could find. By the early 1960's, blue and humpback whales had been virtually exter-

minated, driven to "commercial extinction," where there were too few remaining to make hunting them worthwhile. (Garrett Affidavit at 1). By the early 1970's, the major populations of large baleen whales in the Antarctic and North Pacific oceans had been destroyed. Fin and sei whale populations had been likewise reduced to small percentages of their original levels. *Id.* The whaling industry then refocused its efforts on the remaining available species: the sperm whale, the Bryde's whale, and the smaller minke whale.

The International Convention for the Regulation of Whaling, which created the IWC, arose as a result of the recognized need for some kind of coordinated regulation of international whaling. The Convention was signed in 1946 and entered into force on November 10, 1948. 62 Stat. 1716, T.I.A.S. No. 1849. Under the terms of the Convention, global annual whaling quotas and regulations restricting whaling methods are to be established at annual and special meetings of the IWC. Convention, Art. V ¶ 1. Originally, the IWC was used as a vehicle for the control of whale oil prices. However, since 1972 it has steadily evolved as an agency promoting conservation rather than commercialization of whales.

a) *The Pelly Amendment*

The United States government was a signatory of the Convention and is a member nation in the IWC. It has consistently taken the role of enforcing the quotas as set by the IWC with the threat of economic sanctions against countries which fail to adhere to the IWC limits. In 1971, Congress enacted the Pelly Amendment to the Fishermen's Protective Act of 1967, 22 U.S.C. § 1978, for the express purpose of creating a sanction against countries that refused to conduct their fishing operations consistent with international fishery conservation programs. The Pelly Amendment states that when the Secretary of Commerce determines that nationals of a foreign country are conducting fishing operations which "diminish the effectiveness" of any international fisheries conservation program to which the United States is a party, he shall so certify to the President. 22 U.S.C. § 1978(a)(1). The President may then direct the Secretary of the Treasury to prohibit the importation of fish products of the offending nation. 22 U.S.C. § 1978(a)(4). Within sixty days of certification, the President is required to notify Congress of any action taken as a result of such certification, or of his reasons for taking no action or taking only limited action against the offending nation. 22 U.S.C. § 1978(b).

On November 12, 1974, the Secretary of Commerce certified both Japan and the Soviet Union under the Pelly Amendment. The IWC had set a quota of 5,000 Antarctic minke whales for the 1973–74 season. Both nations had objected to the quota under the procedures set forth in the Convention. The Secretary determined, however, that when the Soviet Union took 4,000 minke whales and Japan took 3,713, that both countries had acted to "diminish the effectiveness" of the Convention. On January 19, 1975, former President Gerald R. Ford made it clear that any taking of whales in excess of IWC quotas would trigger the Pelly Amendment certification, saying that "exceeding the quotas will diminish the effectiveness of the program." White House Press Release, January 17, 1975. (Plaintiff's Brief at 8). The imposition of sanctions was forstalled, however, when both Japan and the Soviet Union then agreed to accept the 1974–75 quotas. *Id.*

The Pelly Amendment has been brought into play several times since. On December 14, 1978, the Secretary of Commerce certified Chile, Peru and the Republic of Korea for exceeding IWC quotas. At that time none of these nations were members of the IWC or signatories of the Convention. Within sixty days after certification, all three had either joined the IWC or committed to do so by the next scheduled annual meeting. Again, in 1979, the threatened certification of Spain led that country to agree to adhere to the IWC fin whale quota for that year, despite having filed a formal objection. *Preparations for the 34th International Whaling Commission Meeting: Hearings before the Subcomm. Hu-*

*man Rights and International Organizations of the House Comm. on Foreign Affairs,* 97th Cong., 2d Sess. 11 (1982) (Congressional Research Service Report).

b) *The Packwood-Magnuson Amendment*

In 1979, Congress determined that the Pelly Amendment, however effective, was inadequate to the task of persuading commercial whaling nations to adhere to IWC decisions. Accordingly, Congress enacted the Packwood-Magnuson Amendment to the Magnuson Fishery Conservation and Management Act of 1976 (hereinafter "Packwood-Magnuson"). 16 U.S.C. § 1821. That Act has, since 1976, regulated commercial fishing within the United States 200-mile fishery conservation zone. It provides for the Secretary of State to grant foreign nations annual allocations of allowable levels of fishing within the 200-mile zone. *Id.*

Packwood-Magnuson amended that Act to provide that the Secretary of Commerce would have the responsibility to ascertain and certify whether "nationals of a foreign country, directly or indirectly, are conducting fishing operations or engaged in trade or taking which diminishes the effectiveness of the International Convention for the Regulation of Whaling." 16 U.S.C. § 1821(e)(2)(A)(i). Upon such certification, the Amendment mandates that the fishing allocation of the offending nation "shall be reduced by the Secretary of State, in consultation with the Secretary [of Commerce], by not less than 50 percent." 16 U.S.C. § 1821(e)(2)(B). If the certification by the Secretary of Commerce is terminated within one year, the suspended allocation may be reinstated. 16 U.S.C. § 1821(e)(2)(C)(iii). If the certification is not terminated within one year, the suspended allocation is permanently rescinded and the Secretary of State "may not make any allocation to that country ... until the certification is terminated." 16 U.S.C. § 1821(e)(2)(D).

The threat of automatic sanctions under Packwood-Magnuson has proved to be an effective incentive in the enforcement of the IWC regulations and quotas. In 1980, both the Republic of Korea and Taiwan

agreed to adhere to IWC regulations not directly involving whaling quotas, when faced with the possibility of Packwood-Magnuson sanctions. *Preparations for the 34th International Whaling Commission Meeting, supra,* at 11. The former United States representative to the IWC views the automatic sanctions under Packwood-Magnuson to be the foundation upon which the present system of international whaling controls has been built. (Affidavit of Thomas Garrett ¶ 9).

c) *The IWC whaling quotas*

In 1981 the IWC voted to amend the quota tables to provide that no sperm whales could be taken in any future year unless a specific quota was established by the IWC for that year. The vote on that issue was 25 to 1, with Japan casting the lone opposition vote. *Review of the 33rd International Whaling Committee Meeting: Hearing before the Subcomm. on Human Rights and International Organizations of the House Comm. on Foreign Affairs,* 97th Cong., 1st Sess. 11 (1981) (Staff Report).

At the next annual meeting, in July, 1982, the IWC voted to impose a five year moratorium on all commercial whaling in order to allow depleted whale stocks to regenerate, and for scientists to have an opportunity to gather more extensive data on the populations and distributions of whale stocks to determine whether commercial whaling could be safely resumed at some future date. *Review of the 34th International Whaling Commission Meeting,* 97th Cong., 2d Sess. 17–19 (1982) (Staff Report). Of the member nations of the IWC, only Japan, the Soviet Union and Norway filed objections to the moratorium.

In July 1982, Japan requested, and was granted, two additional years of sperm whaling through the 1983–84 season. This additional grant was part of a compromise effort to insure passage of the *general* whaling moratorium to begin in 1986. No sperm whale quota was established by the IWC for the 1984–85 season. Thus, under the terms of the 1981 amendment to the

quota tables, any sperm whaling during the 1984–85 season would be in violation of the zero quota which resulted.

d) *The November 13, 1984 exchange of letters*

The Japanese government, apparently well aware of the threat of Packwood-Magnuson sanctions, entered into negotiations with the United States Commissioner to the IWC. On November 13, 1984, the Department of Commerce released copies of an exchange of correspondence between Yasushi Murazumi, Japanese Charge d'Affaires in Washington, D.C., and Secretary Baldridge. Attached to the letter from Murazumi was a document entitled "Summary of Discussions on Commercial Sperm Whaling in the Western Division Stock of the North Pacific, November 1–12, 1984, Washington, D.C." This document described the negotiations between Mr. John V. Byrne, the U.S. Commissioner to the IWC, and Mr. Hiroya Sano, Director General, Fisheries Agency, Ministry of Agriculture, Forestry and Fisheries of Japan. Later the same day, the Secretary responded by letter to Mr. Murazumi in which the Secretary pledged not to certify additional sperm whaling by Japan during the 1984–85 and 1985–86 seasons, provided that the Japanese took the steps outlined in its letter. Specifically, the Secretary concluded that if Japan followed the promises made in its letter to eventually come into voluntary compliance with the IWC sperm whale and moratorium decisions, Japan would not be acting in a manner which would diminish the effectiveness of the Convention, thus avoiding the triggering of Packwood-Magnuson sanctions.

The arrangement worked out between the Secretary and Japan would allow the Japanese whaling fleet to take up to 400 sperm whales during each of the 1984 and 1985 seasons, on the condition that they promise to cease all commercial sperm whaling at the end of the 1987 season. Japan in return agreed to withdraw its objection to the IWC quota table amendment which created the zero quota by no later than December 13, 1984. On December 11, 1984, the Japanese complied with this pledge and withdrew their objection to the amendment. The second part of the agreement was likewise conditioned on a promise by the Japanese. If the Japanese agreed to cease all commercial whaling by April 1, 1988, then they may take up to 200 sperm whales in each of the 1986 and 1987 seasons, and take other species subject to limits acceptable to the United States, to be determined at a later time. The Japanese must withdraw their objection to the general moratorium by April 1, 1985, in order to avoid Packwood-Magnuson certification.

Even as the negotiations which led to the exchange of letters was taking place, the Japanese whaling fleet was out at sea to catch whales. On November 11, 1984, several members of the plaintiff organizations observed and photographed the return and butchering of two sperm whales at Wadaura, Japan. (Affidavit of J. Campbell Snowden). By letter dated November 19, 1985, counsel for the plaintiffs brought to the attention of the Secretary the fact of continued sperm whaling by the Japanese in violation of the IWC quotas, and requested immediate certification. On November 30, 1984, the Secretary, through the General Counsel of the National Oceanic and Atmospheric Administration, responded that he would abide by the terms of the November 13 exchange of letters and would not certify Japan for the ongoing sperm whaling activities.

### ANALYSIS

I. CERTIFICATION BY THE SECRETARY OF COMMERCE OF WHALING IN EXCESS OF THE IWC QUOTAS IS MANDATORY AND NONDISCRETIONARY.

When looking at the meaning of a statute, or a phrase therein, the Court must first look to the plain words of the statute. *United States v. Apfelbaum*, 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). The Pelly Amendment states unequivocably that "when the Secretary of Commerce finds" that a nation is acting so

as to "diminish the effectiveness" of an international fisheries conservation agreement to which the United States is a party, he "*shall* certify such fact to the President." 22 U.S.C. § 1978(a)(2) (emphasis supplied). That this is a mandatory obligation of the Secretary's is borne out by the legislative history of the Pelly Amendment, which is replete with phrases such as "required to certify," "must certify," and "directs the Secretary to certify." *See*, 117 Cong.Rec. 34751 and 47053 (1971); H.R. Rep. No. 468, 92d Cong., 1st Sess. 6 (1971), U.S.Code Cong. & Admin.News 1971, p. 2409. The Packwood-Magnuson Amendment was enacted with much the same language. Once the Secretary has determined that a nation is acting so as to diminish the effectiveness of the International Whaling Convention, he must certify that fact to the President. 16 U.S.C. § 1821(e)(2)(A)(i). Neither statute provides a definition of this key phrase. Only when the words of the statute are ambiguous or unclear is it proper for a court to resort to legislative history to derive the intent of the lawmakers. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Petry v. Block*, 697 F.2d 1169 (D.C.Cir.1983). Because the phrase which triggers certification is not clearly defined in either statute, the Court will look to the legislative history of both Pelly and Packwood-Magnuson to determine its meaning.

The issue in this case is in actuality very simple. It is whether the Secretary has any discretion under the statute to determine what actions will trigger the automatic sanction. The defendants agree with the plaintiffs that the Secretary has a mandatory duty to certify once the circumstances which the phrase "diminishes the effectiveness of the Convention" seeks to define are found to be present. Rather, they argue that the determination of those circumstances has been left in the hands of the Secretary as a threshold discretionary decision to be made before certification becomes mandatory.

Plaintiffs, in their reply memorandum, concede that the Secretary may in fact have some discretion in this area, but that he may not utilize that discretion in the face of violations of IWC quotas, which the plaintiff contends to be the specific protection for which Packwood-Magnuson was created. They refer to numerous quotes of legislative history and a history of consistent agency interpretation as the basis for this argument.

a) *Fishing In Violation Of Quotas Established Under An International Convention Was The Specific Wrong To Which Congress Intended Both Pelly And Packwood-Magnuson To Apply.*

It appears clear from the legislative history that Congress in 1971 specifically had in mind the particular situation present in this case, of a member nation to an international fisheries agreement filing an objection which, although permitted by the terms of the agreement, rendered the agreement itself futile and ineffective. In enacting the Pelly Amendment, Congress cited, as a prime example of a situation which would call for certification, the flagrant overfishing of Atlantic salmon by nations that had filed timely objections to the international ban on such fishing. The objection procedures in use there are similar to that included in the Whaling Convention. Congressman Pelly explained that his Amendment was needed because "under the terms of the governing convention, individual nations are permitted to exempt themselves from the decisions of the commission." 117 Cong.Rec. 34751–52 (1971). These violations of the salmon quota were cited as the primary basis of the need for the United States to use its economic influence so as to reverse the trend. 117 Cong. Rec. 34754 (1971) (statement of Rep. Clausen). It is also apparent that the Pelly amendment was to apply to violations of the International Whaling Convention:

"The saga of the Atlantic salmon unfortunately is being repeated around the world with respect to many other creatures that inhabit the seas, most notably the whale. Commercial pressure has virtually wiped out the largest and most awesome species of whale. The Interna-

tional Whaling Convention, far from being a conservation measure, has proved to be a cloak for over-exploitation on a grand scale." 117 Cong.Rec. 34752 (1971) (statement of Rep. Pelly)

A review of the legislative history of the Pelly Amendment leaves no doubt that the primary purpose behind creating a certification and economic sanction mechanism was to penalize nations that evade international fishery conservation measures by invoking technical treaty rights to exempt themselves from these measures. It was an attempt by Congress to enforce compliance with these international efforts which lacked any real enforcement power of their own. Defendants fail to cite any authority which contradicts this proposition.

This interpretation was also the basis for the Executive Branch position on the Pelly Amendment. The Department of State representative testified on July 8, 1971, that the State Department viewed the bill as providing that

... "if the majority of nations did accept a regulation or a ban on salmon fishing and that regulation applied to U.S. fishermen, and one of the nations of the convention or one of the nations not a member didn't agree with it, as far as trade with the United States was concerned, that such trade restrictions would be applied to fishery products of that nation." 1971 *House Hearings* 394.

Likewise, the Commerce Department, by letter to the House Committee on Merchant Marine and Fisheries, stated that the bill would "authorize the President to impose sanctions against countries which do not abide by that ban whether or not they are members of [the convention] and whether or not, if members of [the convention], they have accepted the ban." H.R.Rep. No. 468, 92d Cong. 1st Sess. 10 (1971), U.S.Code Cong. & Admin.News 1971, p. 2409. It is clear that the problem Congress sought to address with the Pelly amendment was the ability of other nations to ignore international conservation programs by invoking exemption privileges provided for in the treaties. The Executive branch fully agreed.

Thus does the phrase "diminish the effectiveness of" take on meaning and purpose. While many actions might result in a determination by the Secretary that certification is required, Congress specifically and unequivocally intended that such certification be made in the face of a nation attempting to exempt itself from its international fishery conservation obligations.

It appears equally clear that Packwood-Magnuson used the phrase in exactly the same manner as it was intended to be used in Pelly. Packwood-Magnuson was enacted to put teeth into the certification process by eliminating the discretion given the Executive whether to apply sanctions or not. The legislative history shows no evidence that Congress intended to alter the meaning of this key phrase, or that the concern about foreign nations exempting themselves out of international fisheries treaties had in any way abated. Indeed, the discussions before the House Subcommittee on Fisheries and Wildlife Conservation and the Environment in 1979 clearly reflect that this concern was of paramount importance. Mr. Richard A. Frank, then Administrator of the National Oceanic and Atmospheric Administration testified as follows:

"We have used the Pelly amendment most recently in connection with Peru, Chile, and South Korea. They were the most flagerant violators because they were taking whales without regard to IWC quotas ...

"... IWC resolutions are not binding. If a country were violating something in the schedule, for example, taking more whales than the schedule provides, and that were a significant violation, I believe it is clear that the Pelly amendment would apply." *Whaling Policy and International Whaling Commission Oversight*, 96th Cong., 1st Sess. 311–12 (1979).

When asked later if he considered Japan to be at that time in violation of the convention, Mr. Frank replied, "no sir, we have not ... They are not violating an IWC quota or an IWC prohibition." It was with this interpretation of the certification mechanism contained in Pelly that Congress en-

acted Packwood-Magnuson, which was endowed with the same language and the same certification trigger.

b) *Agency Interpretation And Application Of Pelly And Packwood-Magnuson Has Consistently Resulted In Certification For Violations Of International Quotas.*

The Executive Branch, prior to enactment of the Pelly Amendment in 1971, and until as recently as July 24, 1984, consistently has taken the position that intentional fishing in excess of duly established international quotas necessarily "diminishes the effectiveness" of the applicable fisheries conservation program. The Court has already quoted several examples of the Executive's position during the hearings on the Pelly amendment, and will not repeat them here except by reference. Similarly, it has already been noted that this position had not changed by the 1979 hearings on Packwood-Magnuson. Indeed, the Court is struck by the consistency and clarity of the position taken. This position has been echoed in the actions of the Executive as well as in its words.

One such example is found in *Adams v. Vance*, 570 F.2d 950 (D.C.Cir.1978). This case involved the taking of bowhead whales by Alaskan natives. Although bowhead whales are one of the most endangered species, small quotas had been allocated each year for the benefit of Alaskan natives because of the important role whaling has traditionally played in the Eskimo culture. In 1977, the IWC established no bowhead subsistence quota for 1978 based on IWC scientific findings. Although the Alaskan Eskimos vehemently opposed the decision, the United States did not file an objection which, under the terms of the Convention, would have resulted in an exemption to the zero quota. The Eskimos then filed suit to compel the Secretary of State to file an objection.

The objection sought by the Alaskans would have resulted in only a small number of bowhead whales being taken. However, the United States argued that the filing of an objection, even if later withdrawn, would have a devistating effect on the fu-

ture effectiveness of the IWC and the Convention. *Id.* at 952. By affidavit, the Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs testified that "A United States objection at this time would seriously weaken the effectiveness of the IWC as an instrument of conservation." (Mink Affidavit at 7, 8). Further, the Administrator of the National Oceanic and Atmospheric Administration from 1970 to July 1977 testified:

"In my judgment, the ability of the United States to maintain its posture of international leadership in the protection of whales, and to justify the imposition of sanctions upon other nations which object to IWC quotas, depends upon its own scupulous observance of such quotas." (White Affidavit at 2, 3).

In light of this strong sense of leadership in the international whaling community reflected in the Executive's words and acts, it appears a complete reversal for the Secretary of Commerce to agree not to certify a foreign nation whose nationals are intentionally whaling in violation of established IWC quotas. The Court does not agree with the defendants' application of the holding in *Adams*. Defendant would have the Court use *Adams* as a vehicle for denying the plaintiffs relief on foreign policy grounds. However, that case involved a suit to force the Executive to perform a discretionary act, namely to file an objection to the zero bowhead whale quota, after the Executive had deliberated and decided that such an objection was not in the best interest of either the United States or the Convention. Here, plaintiffs are seeking to compel the performance of a non-discretionary duty on the part of the Secretary of Commerce to certify any nation which is intentionally whaling in violation of the IWC quotas.

Further, if the Executive could interpret the taking of 15 or 20 bowhead whales as a threat to the entire IWC structure, the Court cannot see how the taking of 1200 sperm whales over a four-year period when no IWC quotas are in effect and unknown numbers of minke and Bryde's whales "ac-

ceptable to the United States after consultation with the Government of Japan" over a two year period when no IWC quotas are in effect, could possibly be countenanced.

Finally, the December 13, 1984 exchange of letters is inconsistent with the Secretary's own interpretation of the law stated in correspondence with Sen. Packwood less than six months before. Sen. Packwood had written concerning the Secretary's interpretation as it would apply to the complete moratorium on commercial whaling to go into effect at the beginning of the 1986 whaling season. The Secretary responded as follows:

"You noted in your letter the widespread view that any continued commercial whaling after the IWC moratorium decision takes effect would be subject to certification. I agree, since any such whaling attributable to the policies of a foreign government would clearly diminish the effectiveness of the IWC ...

"Any government that chooses to ignore the commercial whaling moratorium implemented by the IWC and thereby diminishes the effectiveness of the IWC should be prepared to accept the consequences of this non-compliance." Letter from Secretary of Commerce to Sen. Packwood (July 24, 1984).

It is inconceivable to this Court how the Secretary can reconcile his decision not to certify the Japanese sperm whaling with the clear purpose, intent and history of the law he is charged with enforcing, and with the equally consistent interpretation given that law by the agency and by the Secretary himself.

Therefore, there being no material facts in dispute, the plaintiffs' motion for summary judgment is granted, and the defendants' cross-motion is denied.

c) *The Intervenor's Motion For Summary Judgment Must Be Denied.*

The defendant-intervenors JWA/JFA have filed a motion for summary judgment which takes the position that the Secretary may *never* certify a nation which has filed a timely objection as provided for by the Convention. They argue extensively that the zero sperm whale quota and the general commercial whaling moratorium are illegal under the terms of the Convention and under international law. Therefore, the theory goes, if the quotas are themselves illegal, then Japan cannot be sanctioned for ignoring them. The intervenors also argue that certification is itself an illegal agency action, in violation of the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, as the agency has never promulgated regulations defining the statutes, nor provided the Japanese with notice and hearing under 5 U.S.C. § 556. Both of these arguments fail on their face and must be rejected by the Court.

Intervenors' entire discussion of the alleged improprieties which resulted in the passage of the zero sperm whale quota and the general commercial whaling moratorium, while certainly offering some fascinating insights into the inner workings of such treaties, is entirely irrelevant to the issue in this case. This Court is not being asked to interpret or pass judgment on an international treaty or any actions taken as a result thereof. Rather, the only true issue in this case is whether there exists a non-discretionary duty to certify and did the Secretary fail to so do. The relevant statutes make no mention of being applicable only to nations which are members of an international convention and which fail to timely object to the regulations of that convention. Rather, the plain words of both Pelly and Packwood-Magnuson operate to include any nation which "diminishes the effectiveness" of such a program. The statutes make no distinction between signatory or non-signatory, objector or non-objector. Indeed, in December of 1978, the Secretary certified Chile, Peru and South Korea under the Pelly Amendment at a time when none of these nations were members of the IWC.

Thus, it makes no difference that the Japanese filed a valid objection, or whether the moratoria where "illegal." The statute only requires that the nation to be certified has acted so as to diminish the effectiveness of the Convention. The legislative history and consistent agency interpreta-

tion shows that any nation which exceeds the IWC quotas will be viewed as acting to diminish the effectiveness of the IWC and will be certified, regardless of the nations own view of the propriety of the quotas themselves.

■ Intervenors' Administrative Procedure Act argument is equally as facetious. Intervenor has ignored a fundamental of administrative law, that notice and hearing are only required for the taking of rights or property. Here, what is being taken is a revocable license, the license given to a foreign country to come into United States waters and fish. This is a privilege which does not give rise to a property right of the Japanese. *See, United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950). Further, it is clear that Section 556 of the APA, 5 U.S.C. § 556, only sets forth the procedural rights that are available when a trial-type hearing is required. Section 554 of the APA states that such a hearing is required "in every case of adjudication *required by statute* to be determined on the record after opportunity for an agency hearing ..." 5 U.S.C. § 554(a). *Accord, Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed.2d 616 (1950); *Sea-Land Service, Inc. v. Federal Maritime Commission,* 653 F.2d 544, 551 n. 18 (D.C.Cir.1981); *Marathon Oil Company v. Environmental Protection Agency,* 564 F.2d 1253, 1263–64 (9th Cir.1977). Neither Pelly nor Packwood-Magnuson require that a determination be made after a trial-type hearing on the record. Thus there has been no violation of either § 556 or § 554 of the APA.

Even assuming *arguendo* that these statutes did require a hearing with respect to certification, plaintiffs would still be entitled to the relief they seek. The sole factual issue to be determined prior to certification is whether the Japanese are taking sperm whales in excess of the established IWC zero quota. Because that fact is established in this Court proceeding, and is stipulated to by all parties, there is no factual issue to be resolved by an evidentiary hearing. *Cerro Wire & Cable Co. v.*

*Federal Energy Regulatory Commission,* 677 F.2d 124, 128–9 (D.C.Cir.1982).

■ Nor is the Secretary required by law to adopt substantive interpretive regulations prior to exercising his duty to certify. The Supreme Court specifically rejected that argument in *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), holding that to require proceedings initially by rulemaking "would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *Id.* at 202, 67 S.Ct. at 1580. This holding has continued to be followed to this day. *See, National Labor Relations Board v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Towns of Concord, Norwood and Wellesley, Massachusetts v. Federal Energy Regulatory Commission,* 729 F.2d 824, 830 (D.C.Cir.1984); *Arkansas Power and Light Co. v. Interstate Commerce Commission,* 725 F.2d 716, 723 (D.C.Cir.1984). The case on which Intervenors rely, *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), merely stands for the proposition that *if* an agency promulgates interpretive rules, it must do so in conformance with APA procedures.

Further, intervenor's argument that an earlier treaty must take precedence over a later act of Congress does not apply in this case. The Supreme Court has held on numerous occasions for more than a century that such a treaty is subject to "such acts as Congress may pass for its enforcement, modification, or repeal." *Head Money Cases,* 112 U.S. 580, 599, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884). *See also, Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed.2d 729 (1951); *Pigeon River Improvement Slide & Boom Co. v. Charles W. Cox. Ltd.,* 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed.2d 695 (1934); *United States v. Payne,* 264 U.S. 446, 448, 44 S.Ct. 352, 353, 68 L.Ed. 782 (1924). Even without this authority, the Court does not view the Pelly and Packwood-Magnuson Amendments as conflicting with the Convention. There is nothing in the Convention which states that upon ratification of the treaty the United States gave up its right to persuade other nations to comply with the IWC whal-

ing quotas established pursuant to that very convention. The Convention provides that Japan may exempt itself from IWC quotas by filing a timely objection. No provision of the Convention, however, restricts the right of any other party to impose unilateral sanctions to enforce these same quotas, which is what the statutes at issue provide for, and what the plaintiffs seek here.

■ Finally, Intervenor's argument that the doctrine of primary jurisdiction should apply is incorrect. This case is a simple issue of statutory interpretation. Questions of law are particularly within the competence of the judiciary to resolve, and are not subject to initial agency consideration under the primary jurisdiction doctrine. *Nader v. Alleghany Airlines*, 426 U.S. 290, 305-6, 96 S.Ct. 1978, 1987-88, 48 L.Ed.2d 643 (1976); *Great Northern Ry. Co. v. Merchant's Elevator Co.*, 259 U.S. 285, 290-91, 42 S.Ct. 477, 478-79, 66 L.Ed. 943 (1922).

II. THE MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED IS DENIED AS THE INCORRECT LEGAL STANDARD HAS BEEN APPLIED AND AS AN INJUNCTION IN THE NATURE OF MANDAMUS IS PROPER WHERE, AS HERE, A NONDISCRETIONARY ACT IS INVOLVED.

Intervenors have filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). As basis for this motion, the cite *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921 (D.C.Cir.1958). Further, they argue that the Secretary does have discretion to determine what actions "diminish the effectiveness" of the Convention, therefore making the remedy of mandamus unavailable. The Court finds neither argument to be convincing, and, therefore, denies the motion.

■ Initially, as has been discussed above, when a foreign nation intentionally takes whales in excess of an established IWC quota, that action necessarily diminishes the effectiveness of the Convention and automatically triggers certification. That has been the consistent legislative and agency interpretation for almost fifteen years. Therefore, this is a nondiscretionary ministerial duty for which relief in the nature of mandamus is appropriate. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). *See also, Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 498, 18 L.Ed. 437 (1866); *13th Regional Corporation v. U.S. Dept. of Interior*, 654 F.2d 758, 760 (D.C.Cir.1980).

This is certainly such a case as envisioned by the law cited above. Congress created in 1971 a mandatory duty on the part of the Secretary of Commerce to certify actions of foreign nationals that diminish the effectiveness of international fishery conservation programs. It added in 1979 a mandatory economic sanction required to be imposed by the Secretary of State in the case of the certification of actions that specifically diminish the International Convention for the Regulation of Whaling. The obligation to act is preemptory and clearly defined. The law not only authorizes the demanded action, but requires it. Nothing is left for discretion. Almost fifteen years of administrative interpretation and congressional understanding of, and reliance upon, the interpretation that intentional whaling in violation of IWC quotas triggers the certification process, have established a clear meaning of the phrase. There is quite simply nothing for the Secretary to decide. He must certify under the plain meaning of the statute.

Intervenors argue that plaintiffs have failed to meet the four-part test laid out in *Virginia Petroleum Jobbers, supra*. However, the Court is in agreement with the plaintiffs that that case has no application to a request for a permanent injunction. Here, plaintiffs' motion for summary judgment seeks a final determination of the merits of the case and an award of permanent relief. Thus, *Virginia Petroleum Jobbers* is irrelevant for purposes of this case.

The correct standard to be applied in a case such as this is that enunciated in *Council of and for the Blind of Delaware County Valley v. Regan,* 709 F.2d 1521, 1533 (D.C.Cir.1983), which established a three-pronged test for mandamus relief. Such relief is available if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Id.* Plaintiffs have passed all three prongs in this case and are therefore entitled to the permanent injunction which they seek. Plaintiffs have a clear right to relief and defendants have a clear duty to act, as discussed above. Most importantly, there is no other remedy available which will have the same effect of accomplishing the plaintiffs' purpose. Plaintiffs seek to protect and preserve the remaining whale stock left on this planet after years of systematic decimation. Pelly and Packwood-Magnuson were enacted to this same end, and plaintiffs now seek to compel the Secretary to invoke these statutes as is his duty. There is no other form of relief available which would serve the same purpose. No amount of damages or alternative action by the defendants would have the same effect. Therefore, the motion to dismiss is denied, and the permanent injunction will issue under 28 U.S.C. § 1361.

## CONCLUSION

The Court holds here that the Secretary of Commerce had a clear and nondiscretionary duty to certify the Japanese whaling in excess of the established IWC quotas. By not doing so, the Secretary has ignored the plain intent of Congress, and the historic significance of United States sanctions in the sphere of international whale conservation. The Secretary of Commerce may not unilaterally, or even bilaterally with the Japanese, dismiss the mandate of the IWC so as to proceed with his own particular vision of whale preservation. Congress has not given him that authority, and has, in fact, explicitly created an automatic sanction to prevent this very situation. Congress, in enacting Pelly in 1971 and Packwood-Magnuson in 1979, wanted to send out a clear message to the world that the United States was committed to being in the vanguard of the fight to preserve the whale. The Secretary may not now distort his clear Congressional mandate by permitting a foreign nation (here Japan) to violate the IWC quotas without that nation facing the immediate consequences as set forth by the above-mentioned statutes.

In view of the foregoing, the Court, by Order of even date herewith, will grant the plaintiffs' motion for summary judgment, deny the defendants' motion for summary judgment and deny the defendant intervenors' motions for summary judgment and to dismiss, and order the defendants Baldridge and Schultz to immediately certify to the President that Japan is in violation of the IWC sperm whaling quota and enjoin them permanently from agreeing not to reduce, or failing to reduce, Japanese fishing quotas in consequence of such certification, and thus save another vital national, if not international, goal of the preservation of an almost extinct species of vital importance to humankind.