768 F.2d 426
 247 U.S.App.D.C. 309, 15 Envtl. L. Rep. 20,877
 AMERICAN CETACEAN SOCIETY, et al.
v.
Malcolm BALDRIGE, Secretary of Commerce, et al., Appellants
Japan Whaling Association, et al.
AMERICAN CETACEAN SOCIETY, et al.
v.
Malcolm BALDRIGE, Secretary of Commerce, et al.
Japan Whaling Association, et al., Appellants.
 Nos. 85-5251, 85-5252.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 16, 1985.
Decided Aug. 6, 1985.
 
 Appeals from the United States District Court for the District of columbia.
 Dianne H. Kelly, Atty., Dept. of Justice, Washington, D.C., with whom F. Henry Habicht, II, Asst. Atty. Gen., Donald A. Carr and Martin W. Matzen, Attys., Dept. of Justice, Washington, D.C., and Robert J. McManus, Atty., Dept. of Commerce, Washington, D.C., were on the brief, for the federal appellants.
 Scott C. Whitney, Washington, D.C., with whom Steven R. Perles, Washington, D.C., was on the brief, for appellants Japan Fisheries Association and Japan Whaling Association.
 James A. Beat, Washington, D.C., with whom William D. Rogers and John F. Libby, Washington, D.C., were on the brief, for appellees.
 Before WRIGHT and TAMM, Circuit Judges, and OBERDORFER,* District Judge.
 Opinion for the court filed by Circuit Judge WRIGHT.
 Dissenting opinion filed by District Judge OBERDORFER.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 In this case we review a decision of the District Court that the Secretary of Commerce must, under the Pelly and Packwood-Magnuson Amendments, see 22 U.S.C. Sec. 1978 (1982); 16 U.S.C. Sec. 1821(e)(2) (1982), certify Japan as "diminish[ing] the effectiveness" of the International Convention for the Regulation of Whaling (ICRW), entered into force November 10, 1948, 62 STAT. 1716, T.I.A.S. 1849, reproduced in Joint Appendix (JA) at 47-57, because Japanese nationals are undisputedly harvesting whales in excess of the harvest quotas promulgated under that Convention.
 
 
 2
 We agree with the District Court's ultimate conclusion that certification in this case is mandatory, though we reach it for slightly different reasons. Thus we hold that, although in some situations the Secretary has discretion whether to certify, the Secretary is required by law to certify a foreign country whose nationals are harvesting whales in excess of ICRW quotas. Consequently, we affirm the judgment of the District Court.
 
 I. BACKGROUND
 
 3
 A. The International Convention for the Regulation of Whaling
 
 
 4
 The ICRW was formed in 1946 to regulate whaling by "establish[ing] a system of international regulation for the whale fisheries to ensure proper and effective conservation and development of whale stocks." Preamble, JA 48. Toward this end, a Schedule of specific requirements and prohibitions regarding whaling practices was promulgated; this Schedule was adopted as part of the Convention. See Article I, JA 48; Schedule, JA 52-56.
 
 
 5
 In addition, the signatory nations agreed to establish an International Whaling Commission (IWC). See Article III, JA 48. The ICRW authorized the IWC to study whales, whale stocks, and whaling practices. See Article IV, JA 49. The IWC was also authorized to amend the ICRW Schedule
 
 
 6
 by adopting regulations with respect to the conservation and utilization of whale resources, fixing (a) protected and unprotected species; (b) open and closed seasons; (c) open and closed waters, including the designation of sanctuary areas; (d) size limits for each species; (e) time, methods, and intensity of whaling (including the maximum catch of whales to be taken in any one season); (f) types and specifications of gear and apparatus and appliances which may be used; (g) methods of measurement; and (h) catch returns and other statistical and biological records.
 
 
 7
 Article V, JA 49-50.
 
 
 8
 With respect to such amendments, the ICRW provided for an objection procedure. Under this procedure, any of the member nations may file an objection to a Schedule amendment within 90 days of being notified of the amendment. If such an objection is filed in a timely manner, the objecting nation is not bound by the amendment (although the non-objecting nations are bound). Once an objection is withdrawn, however, it cannot be refiled. See Article V, JA 50.
 
 B. U.S. Enforcement Legislation
 
 9
 Under the ICRW, the IWC itself has no enforcement powers against nonmembers or against members who, by objecting, choose not to be bound by a given IWC determination. This lack of enforcement ability is typical of international fishery and wildlife conservation programs. To provide enforcement leverage for this and other such programs, Congress in 1971 enacted the Pelly Amendment. See 22 U.S.C. Sec. 1978. Although this Amendment focused on the depletion of North Atlantic salmon stocks by Denmark in excess of the quotas for fishing those stocks set under the International Convention for the Northwest Atlantic Fisheries (ICNAF), it clearly covered whaling as well. See H.R.Rep. No. 92-468, 92d Cong., 1st Sess. 4-6 (1971) (hereinafter Pelly House Report) 117 Cong.Rec. 34752 (1971) (statement of Rep. Pelly).
 
 
 10
 The Pelly Amendment provides that "[w]hen the Secretary of Commerce determines that nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program, the Secretary of Commerce shall certify such fact to the President." 22 U.S.C. Sec. 1978(a)(1). The term "international fishery conservation program" is defined as "any ban, restriction, regulation, or other measure in effect pursuant to a multilateral agreement which is in force with respect to the United States, the purpose of which is to conserve or protect the living resources of the sea." Id. Sec. 1978(h)(3). The phrase "diminish the effectiveness" is not defined in the statute.
 
 
 11
 The legislative history of this statutory provision clearly indicates that it authorizes certification of activities of nonmembers or members acting under a valid objection to an IWC Schedule amendment. See Pelly House Report at 5, 8-10 (explaining that Denmark, although it had objected to an ICNAF ban and was thus "free to ignore the ban" under the convention, would be covered under the Pelly Amendment).[1] The Amendment further provides that
 
 
 12
 [u]pon receipt of any certification made under [22 U.S.C. Sec. 1978(a)(1) ], the President may direct the Secretary of the Treasury to prohibit the bringing or the importation into the United States of fish products * * * from the offending country for such duration as the President determines appropriate and to the extent that such prohibition is sanctioned by the General Agreement on Tariffs and Trade.
 
 
 13
 22 U.S.C. Sec. 1978(a)(4). Thus the President is authorized to place a foreign country in the position of having all its fish product exports to the United States prohibited for as long as the President deems necessary if the country's nationals "diminish the effectiveness" of an international fishery conservation program--whether or not the fishing is legal under the terms of the Convention by virtue of the foreign country having objected to the relevant provision or being a nonmember nation.[2] In addition, the President is required to notify Congress of any actions taken pursuant to certification within 60 days of that certification; if the President does not impose the sanctions authorized, he must also give reasons to Congress for his failure to do so. See 22 U.S.C. Sec. 1978(b).[3]
 
 
 14
 After passage of the Pelly Amendment, several certifications occurred, although no sanctions were ever imposed by the President against the offending countries. Instead, the certifications were used to extract conservation agreements from the offending nations. Further, the certifications that were made were not accomplished in a notably expeditious fashion. See, e.g., 125 Cong.Rec. 22084 (1979) (statement of Rep. Oberstar). In response to the non-imposition of the Pelly Amendment's discretionary sanctions and to the perceived dilatory certification decisionmaking on the part of the Secretary of Commerce, Congress in 1979 passed the Packwood-Magnuson Amendment. See 16 U.S.C. Sec. 1821(e)(2).
 
 
 15
 The Packwood-Magnuson Amendment provides that if the Secretary of Commerce certifies that a country is diminishing the effectiveness of the IRCW (this provision applies only to the ICRW), the Secretary of State must impose a sanction against the offending country.[4] The sanction is an immediate reduction, by not less than 50 percent, of any allocation for fishing in United States territorial waters that is in effect for that country on the date of certification or that would otherwise be made within the year following certification. 16 U.S.C. Sec. 1821(e)(2)(B).[5] If the certification is terminated within one year by virtue of a determination by the Secretary of Commerce that the justification for the certification has ceased, the prior allocation must be reinstated. Otherwise, the reduced allocation remains in effect until such time as the certification is terminated. The Packwood-Magnuson Amendment, therefore, did not alter the Pelly Amendment's provision regarding certification of foreign countries; it simply provided for a mandatory sanction where certification occurs in the whaling context.[6]
 
 
 16
 The Packwood-Magnuson Amendment also included two provisions amending the Pelly Amendment. The first one requires prompt action by the Secretary with respect to certification decisions. This provision states that
 
 
 17
 the Secretary of Commerce * * * shall--
 
 
 18
 (A) periodically monitor the activities of foreign nationals that may affect the international programs referred to in paragraphs (1) and (2);
 
 
 19
 (B) promptly investigate any activity by foreign nationals that, in the opinion of the Secretary, may be cause for certification under paragraphs (1) or (2); and
 
 
 20
 (C) promptly conclude; and reach a decision with respect to; any investigation commenced under subparagraph (B).
 
 
 21
 22 U.S.C. Sec. 1978(a)(3). The second amending provision provides for periodic review by the Secretary of the validity of his certification decision and for its termination when it is no longer necessary. See id. Sec. 1978(d). The overall thrust of the Packwood-Magnuson Amendment, therefore, was to narrow Executive Branch discretion allowed by the Pelly Amendment.
 
 C. History of This Dispute
 
 22
 In 1981 the IWC voted to provide a zero quota for North Pacific sperm whales. Specifically, the IWC members agreed that no sperm whales could be taken unless the IWC established a specific quota for a given year. Japan filed a timely objection to this quota. In 1982 Japan succeeded in obtaining an IWC revision of this zero quota for the following two harvest seasons (and for those seasons only). Also in 1982, however, the IWC voted to implement a five-year moratorium on all whaling beginning in 1986. The purpose of this moratorium was to allow regeneration of depleted whale populations and to afford scientists an opportunity to gather additional information on the vitality and security of whale populations. The decision provides for automatic reconsideration of the moratorium in 1990. Japan, the Soviet Union, and Norway filed timely objections to the moratorium.
 
 
 23
 Pursuant to Japan's formal objection to the sperm whale quota, Japanese whalers have continued to harvest whales in excess of the IWC (zero quota) limits. See American Cetacean Society v. Baldridge [sic], 604 F.Supp. 1398, 1404, 1409 (D.D.C.1985). In response to these activities Greenpeace and other conservation organizations filed this suit on November 8, 1984, requesting that the District Court order the Secretary of Commerce to certify Japan under the Pelly and Packwood-Magnuson Amendments. They contended that such certification is mandatory and nondiscretionary where harvesting that is clearly in excess of the IWC quotas occurs under the auspices of a foreign government.
 
 
 24
 Also in November 1984 the Secretary of State and the Secretary of Commerce entered into negotiations with Japan regarding its whaling activities. On November 13, 1984 an executive agreement was reached in an exchange of letters between the United States and Japan. See JA 78-84. In these letters the United States agreed not to certify Japan under the Pelly and Packwood-Magnuson Amendments in exchange for Japan's agreement to cease all whaling in 1988 (two years after the moratorium goes into effect) and to take no more than 400 sperm whales in each of the 1984 and 1985 seasons, no more than 200 sperm whales in each of the 1986 and 1987 seasons, and an "acceptable" number of Bryde's and minke whales in the 1986 and 1987 seasons. See JA 81-82. This agreement, therefore, allows continued Japanese violation of the quotas until 1988 with no imposition of sanctions by the United States. Japan in turn agreed to withdraw its IWC objections: to the sperm whale quota by December 13, 1984, to become effective in 1988 (which it did, see JA 106), and to the moratorium by April 1, 1985, also to become effective in 1988.
 
 
 25
 On March 5, 1985, however, Judge Richey issued an order and opinion granting the plaintiffs the relief they requested and ordering the Secretary of Commerce to certify Japan. See 604 F.Supp. at 1411. The government immediately appealed to this court, which granted a stay of the order pending appeal.[7] In response to the District Court's decision, Japan has indicated that it would not withdraw its general objection to the moratorium on April 1, 1985, as agreed. It has also indicated, however, that it would withdraw that objection within five days of a decision by this court reversing the District Court. See brief for federal appellants at 9-10.
 
 II. LEGAL PRINCIPLES AND STANDARD OF REVIEW
 
 26
 The District Court determined that there were no genuine issues of material fact and that the plaintiffs were entitled to judgment as a matter of law. See 604 F.Supp. at 1404-1408.[8] The District Court further concluded that issuance of a writ of mandamus was appropriate in the circumstances of this case. See id. at 1410-1411.[9]
 
 
 27
 The government does not contend on this appeal that a genuine issue of material fact exists. Rather, it argues that the District Court's view of the law was erroneous and that issuance of the writ of mandamus was unsupported by the substantive statute. Specifically, the government interprets the statute as affording it broad discretion in deciding whether to certify Japan in the circumstances of this case. And the government contends that its interpretation of the statutory language is entitled to deference because Congress did not address the specific question at issue here and thus implicitly delegated the task of filling the statutory gap to those charged with implementing the statute (here the Secretary of Commerce). The government further argues that because (according to its interpretation of the statute) it has discretion with respect to the action sought by the plaintiffs the remedy of mandamus is precluded. The government goes on to argue that it exercised its discretion in a reasonable manner and that its decision must therefore be upheld. These arguments make clear that we review here a purely legal determination on the part of the District Court. Consequently, we perform that review de novo.
 
 A. Interpretation of the Statute
 
 28
 The fundamental question here is one of statutory interpretation. As this court has noted previously, our first task in approaching such a question is to determine whether Congress had an intent with respect to the relevant issue. " 'If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.' " American Methyl Corp. v. EPA, 749 F.2d 826, 833-34 (D.C.Cir.1984) (quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ---, --- n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984)). See also Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc., --- U.S. ---, ---, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985). In this step, "we are not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." Rettig v. Pension Benefit Guaranty Corp., 744 F.2d 133, 141 (D.C.Cir.1984). See also State of Montana v. Clark, 749 F.2d 740, 745 (D.C.Cir.1984).
 
 
 29
 If we determine that Congress had no intent regarding the issue in question, then we must consider whether Congress delegated to the agency the task of filling the statutory gaps or of interpreting statutory ambiguities. If Congress has explicitly delegated to the agency the responsibility of "explicat[ing] the ambiguous language or fill[ing] the statutory void," State of Montana, supra, 749 F.2d at 745, then we must "affirm the agency's construction unless [it is] arbitrary, capricious, or manifestly contrary to law." Id. See also 5 U.S.C. Sec. 706(2)(A) (1982). If Congress has implicitly delegated that responsibility to the agency, "Chevron commands that the court affirm an agency's interpretation of a statute it is entrusted to administer provided that it is 'reasonable.' " State of Montana, supra, 749 F.2d at 745. Thus, where Congress has delegated--explicitly or implicitly--certain interpretive power to the agency, we will defer to the agency's interpretation if it falls within the boundaries of that delegation. We emphasize again, however, that this analysis is proper only if Congress itself had no intent regarding the question at issue.
 
 B. Propriety of Mandamus
 
 30
 It is well established that mandamus is proper only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." Council of and for the Blind of Delaware County Valley v. Regan, 709 F.2d 1521, 1533 (D.C.Cir.1983) (en banc ). Mandamus will issue " 'only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable.' " 13th Regional Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 760 (D.C.Cir.1980) (quoting United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931) ).[10]
 
 
 31
 As this court has noted previously, however, "[t]he requirement that a duty be 'clearly defined' to warrant issuance of a writ does not rule out mandamus actions in situations where the interpretation of the controlling statute is in doubt. * * * As long as the statute, once interpreted, creates a peremptory obligation for the officer to act, a mandamus action will lie." 13th Regional Corp., supra, 654 F.2d at 760. The question, therefore, is one of congressional intent: "If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose." Estate of Smith v. Heckler, 747 F.2d 583, 591 (10th Cir.1984) (citing Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419 v. Brown, 656 F.2d 564, 566 (10th Cir.1981)). See also Work v. Rives, 267 U.S. 175, 177, 45 S.Ct. 252, 69 L.Ed. 561 (1925).
 
 
 32
 Our approach in addressing a request for a writ of mandamus is thus entirely consistent with the statutory interpretation approach set forth in Chevron, supra : As with any statutory question, the first step is to determine the intent of Congress. If Congress had an intent with respect to the question at issue and if that intent was to create a mandatory, nondiscretionary duty on the part of the official(s) charged with administering the statute, then mandamus is appropriate (if no other remedy is adequate). Alternatively, even if Congress had an intent, if it did not intend to create a mandatory duty, mandamus is not appropriate. So too, if Congress had no particular intent but rather intended to delegate the interpretive function to the agency, mandamus is precluded.
 
 
 33
 The demarcations between these classes of cases will not always be self-evident, however. For example, Congress may delegate some interpretive authority to an agency and yet simultaneously have a specific intent with respect to some situations that might normally be thought to fall within the boundaries of the delegated discretion. "In other words, even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated." Davis Associates, Inc. v. Secretary, Dep't of HUD, 498 F.2d 385, 389 n. 5 (1st Cir.1974). See also Estate of Smith, supra, 747 F.2d at 591; Carpet Layers Local 419, supra, 656 F.2d at 566; Commonwealth of Pennsylvania, By Sheppard v. National Ass'n of Flood Insurers, 520 F.2d 11, 26-27 (3d Cir.1975); De La Fuente v. Stokely-Van Camp, Inc., 514 F.Supp. 68, 82 (C.D.Ill.1981); Corrugated Container Corp. v. Community Services Administration, 429 F.Supp. 142, 151-152 (W.D.Va.1977). Consequently, we must be careful to ascertain as precisely as possible the exact contours of congressional intent and of congressional delegation. With this cautionary thought in mind, we proceed to the statutory interpretation issue presented in this case.
 
 III. DISCUSSION
 
 34
 The precise question in this case is whether the statutory requirement that the Secretary of Commerce certify a foreign country when he determines that nationals of the country are acting so as to diminish the effectiveness of the ICRW imposes on the Secretary a nondiscretionary duty to certify when he determines that the nationals of a foreign country are harvesting whales in excess of an IWC quota.
 
 
 35
 A. Identification of the Governing Statutory Provision
 
 
 36
 As noted above, there are two legislative enactments at the center of this controversy. In determining congressional intent as to the key statutory phrase, it is necessary first to ascertain which statute containing that phrase is the relevant statute in the situation at hand. On this issue, the parties' positions are quite unclear. For example, all of the parties refer to the legislative history of both the Pelly and Packwood-Magnuson Amendments without indicating which statutory provision is the critical one.
 
 
 37
 Although it is clear that certification in this case would result in imposition of the Packwood-Magnuson sanction, we are concerned here with the statute governing the certification itself. The Pelly Amendment provides for investigation of suspected actions that might qualify for certification and for certification of actions that "diminish the effectiveness" of an international fishery conservation program. It then authorizes the President, at his discretion, to impose certain sanctions on the certified country. The Packwood-Magnuson Amendment, on the other hand, provides for mandatory imposition of other sanctions "[i]f the Secretary issues a certification with respect to any foreign country * * *." 16 U.S.C. Sec. 1821(e)(2)(B). Such certification, for purposes of the Packwood-Magnuson Amendment, includes only a certification with respect to the ICRW. Id. Sec. 1821(e)(2)(A)(i).
 
 
 38
 These provisions indicate that certification of a country for diminishing the effectiveness of the ICRW in fact occurs under the Pelly Amendment; only after certification occurs do the Packwood-Magnuson Amendment mandatory sanction provisions kick in. This interpretation is consistent with the legislative history of the Packwood-Magnuson Amendment, which indicates that the purpose of that Amendment was simply to create a new sanction for ICRW certifications--not to alter the certification process. See S.Rep. No. 96-72, 96th Cong., 1st Sess. 6 (1979); 125 Cong.Rec. 22082 (1979) (statement of Rep. Murphy).
 
 
 39
 One provision of the Packwood-Magnuson Amendment, however, seems at first reading to cast some doubt on this theory. That provision states: "A certification under [the Packwood-Magnuson Amendment] shall also be deemed a certification for the purposes of section 1978(a) of title 22 [the Pelly Amendment]." 16 U.S.C. Sec. 1821(e)(2)(A)(i). Although this language could be interpreted to mean that an ICRW-related certification in fact occurs under the Packwood-Magnuson Amendment, we conclude that it is better read as meaning that a certification made under the Pelly Amendment but qualifying under the Packwood-Magnuson Amendment (that is, one relating to the ICRW) is also a certification for purposes of the discretionary Pelly Amendment sanctions authorized by 22 U.S.C. Sec. 1978(b). See note 6 supra. That is, a country that is certified for ICRW-related actions is automatically sanctioned under Packwood-Magnuson and also may, at the President's discretion, be sanctioned under the Pelly Amendment itself. This interpretation is supported by the fact that the Packwood-Magnuson Amendment refers to the possibility of the Secretary terminating certification under 22 U.S.C. Sec. 1978(d). See 16 U.S.C. Secs. 1821(e)(2)(C)(ii) & (D). Section 1978(d), however, applies specifically to termination of certifications made under the Pelly Amendment.[11]
 
 
 40
 In sum, therefore, although the certification language appears in both the Pelly and the Packwood-Magnuson Amendments, we are concerned here with its meaning in the Pelly Amendment, for ICRW certifications are actually made under that Amendment. Thus we look first to the language and legislative history of the Pelly Amendment itself to determine congressional intent as to the meaning of this phrase. Legislative history subsequent to the Pelly Amendment is relevant only for the limited purpose of determining whether Congress later expressed a different intent, which would then govern this case.
 
 
 41
 B. Interpretation of the Governing Statutory Provision
 
 The relevant statutory language provides:
 
 42
 When the Secretary of Commerce determines that nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program, the Secretary of Commerce shall certify such fact to the President.
 
 
 43
 22 U.S.C. Sec. 1978(a)(1). Under this provision there are two steps in the certification process. First, the Secretary must determine whether actions of foreign nationals are "diminish[ing] the effectiveness" of an international fishery conservation program. Second, if he so determines he shall certify that fact to the President. We will address each statutory step separately.
 
 
 44
 1. Does whaling in violation of an IWC quota require that the Secretary conclude that the foreign nation is "diminishing the effectiveness" of the ICRW?
 
 
 45
 a. Statutory language. The critical statutory phrase, "diminish the effectiveness," is not defined in the statute. The language, furthermore, does not indicate the boundaries of administrative discretion intended by Congress to apply. To ascertain congressional intent, therefore, we turn to the relevant legislative history.
 
 
 46
 b. Legislative history of the Pelly Amendment. The House and Senate committee reports and statements on the floor of the Congress give clear indications of congressional intent with respect to the critical language. Specifically, they indicate quite plainly that fishing in excess of internationally set quotas was considered an automatic trigger of certification.
 
 
 47
 The Senate Report, for example, states that the purpose of the Amendment was
 
 
 48
 to amend the Fisherman's Protective Act * * * to prohibit the importation of fishery products from nations that do not conduct their fishing operations in a manner that is consistent with international conservation programs. It would accomplish this by providing that whenever the Secretary of Commerce determines that a country's nationals are fishing in such a manner, he must certify such fact to the President. * * *
 
 
 49
 S.Rep. No. 92-582, 92d Cong., 1st Sess. 2 (1971) (emphasis added).[12] This statement makes plain that fishing that is inconsistent with internationally set quotas mandates certification. Since, as noted above, member countries that filed valid objections were intended to be covered by this Amendment, see Pelly House Report at 5, 8-10, the failure to act "consistent with" an international program must include fishing by even such members in excess of convention quotas. Consequently, this statement makes abundantly clear that exceeding internationally set quotas was intended to automatically trigger certification.
 
 
 50
 This unambiguous passage finds generous support from other statements in the committee reports and in the floor debates on the bill. In all of these statements, the determination that a country was "violating," acting "inconsistent with," or failing to "abide by" was equated with the fact of certification.
 
 
 51
 For instance, both the Senate and House reports note that the provision requiring that the President notify Congress whenever certification occurred would "insure that the Congress is made aware of the failure of any foreign country to abide by an international fishery conservation program." Pelly House Report at 8; S.Rep. No. 92-582 at 6. These statements obviously contemplate that notification (and thus the certification that triggers it) would automatically occur any time a foreign country exceeded internationally set regulations.
 
 
 52
 In addition, Senator Stevens, the acting chairman of the reporting Senate Committee, clearly envisioned that a violation would trigger the President's power to impose sanctions. Whether application of sanctions was discretionary is not the issue at this point; the issue is whether Congress intended that violations of fishing agreements would automatically trigger that sanction-imposing power. Senator Stevens emphasized:
 
 
 53
 I believe it is important to note that such importation prohibition as permitted by the act is not limited to the particular fish product taken in violation of a particular fish conservation program. For example, although a given country, I use Denmark as an example, violates an international fisheries conservation program, such as the International Convention for the Northwest Atlantic Fisheries--ICNAF, the President may prohibit the importation of all fish products from the offending country, not only salmon. This is important, because it multiplies the effect of a violation manifold. * * *
 
 
 54
 117 Cong.Rec. 47053 (1971) (emphasis added).
 
 
 55
 Neither Senator Stevens nor any other congressional speaker ever remotely suggested that which the government argues here--that Congress intended that there be some intermediate exercise of discretion between (1) the violation of an international fishing agreement and (2) the presidential power to impose sanctions. Rather, the power to impose sanctions was viewed as an immediate incident to recognition of the violation. See also id. at 34750 (statement of Rep. Dingell) ("the purpose of [the bill] * * * is to authorize the President of the United States to prohibit the importation into this country of fishery products from nations that do not conduct their fishing operations in a manner that is consistent with international fishery conservation programs").[13]
 
 
 56
 Indeed, the Executive Branch itself indicated this understanding that the power to impose sanctions was an automatic consequence of a fishing agreement violation. For example, the Commerce Department stated that "the existence of [the ICNAF ban on high seas fishing for Atlantic salmon] would * * * authorize the President to impose sanctions against countries which do not abide by that ban * * *." Pelly House Report at 10. Again, there was no hint of some intermediate exercise of discretion, as the government now contends. Thus the direct legislative history of the Pelly Amendment clearly indicates that Congress intended that fishing in excess of internationally set conservation regulations constitute per se actions diminishing the effectiveness of an international program.
 
 
 57
 c. Congressional use of the key phrase in a similar context. As this court has noted, "[A]bsent evidence to the contrary, words or phrases taken from prior legislation will be given the same meaning, since there is hardly a basis for assuming that the lawmakers had anything else in mind." United Shoe Workers of America v. Bedell, 506 F.2d 174, 183 (D.C.Cir.1974) (footnotes omitted). This admonition is important in this case because the crucial language was used by Congress in an earlier act dealing with a similar situation. In that context, Congress' intent was clearly that quota violations per se diminished the effectiveness of the international program.
 
 
 58
 In the attachments to the House Report on the Pelly Amendment are comments on the proposed Amendment from various Executive agencies. Among these is a letter from the Secretary of Commerce in which the Secretary observes, without elaboration, that the scheme set up by the Pelly Amendment is similar in language and approach to that used in the Tuna Convention Act of 1950 (as amended). 16 U.S.C. Sec. 951 et seq. (1982). See Pelly House Report at 13.
 
 
 59
 Looking to the Tuna Act, we note that, in a provision added in 1962, Congress required the Secretary of Commerce to promulgate regulations prohibiting the importation of tuna while international tuna conservation recommendations were in force whenever fishing was being conducted "in such manner or in such circumstances as would tend to diminish the effectiveness" of the international recommendations. See 16 U.S.C. Sec. 955(c).[14]
 
 
 60
 The legislative history of the 1962 amendments, which added the relevant provisions to the Tuna Act, details what was meant by this language. In the Senate Report accompanying those amendments, the Commerce Committee incorporated into the body of the report a statement by the Secretary of the Interior as to the intended interpretation of this language.[15] The statement was incorporated into the report so as to make perfectly clear what the language meant: "Because the committee regards these provisions as being of key importance, it is including the [Department of Interior's] statement * * * in the report so that the intended operation of the provisions may be clear." S.Rep. No. 1737, 87th Cong., 2d Sess. 6 (1962). The Secretary of the Interior, in turn, stated that the restrictions would apply
 
 
 61
 when any of the following conditions obtains in the country from which [the tuna] is offered for entry:
 
 
 62
 1. The country does not provide or arrange for the timely provision of pertinent statistics to the Commission.
 
 
 63
 2. The country does not put into effect conservation measures applicable to its own fishermen adequate for the implementation of the Commission's recommendations.
 
 
 64
 3. The country, having put conservation measures into effect, does not take reasonable enforcement action.
 
 
 65
 4. The country does not take measures which will enable it to control the landing in its ports and subsequent export of tuna caught in the regulatory area by nationals of third parties.
 
 
 66
 Id. at 7 (emphasis added).
 
 
 67
 This statement makes clear that the 1962 tuna amendments were intended to require Executive action in a variety of situations--one of which was the situation in which a foreign country failed to implement the international body's harvest recommendations. With respect to this situation, no discretion on the part of the Secretary was intended: If a foreign country failed to implement the harvest recommendations, that failure would automatically result in imposition of the statutory sanctions on the foreign country.[16] Given the similarities between the tuna amendments and the Pelly Amendment, the clear congressional intent with respect to the tuna amendments confirms our conclusion that Congress, in enacting the Pelly Amendment, intended that fishing (or whaling) in excess of internationally set quotas would per se "diminish the effectiveness" of the international fishery conservation program.[17]
 
 
 68
 This is not to say that Congress intended that the Secretary have no discretion whatever in making determinations as to what actions "diminish the effectiveness" of international programs. Indeed, we think such an extreme interpretation very unlikely. The Secretary may well, for example, have discretion in determining whether actions inconsistent with nonbinding international resolutions, see Hearings Before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 96th Cong., 1st Sess. 317 (1979) (hereinafter Hearings), JA 213, or actions that undermine achievement of binding regulations but that do not actually violate them "diminish the effectiveness" of those programs. In fact, it seems that, given the legislative history of the 1962 tuna amendments, the language may well have been chosen to allow certification in a variety of situations--some nondiscretionary and some discretionary. We decide simply that the specific type of situation here--clear violation of an internationally set fishing quota--was intended by Congress to trigger automatically the "diminish the effectiveness" determination and that no discretion as to whether to make this determination in this situation was given to the Secretary.
 
 
 69
 d. Subsequent legislative history. Although it is congressional intent relating to the Pelly Amendment that is important to us here, it is possible that subsequent legislative history could affect our conclusion as to congressional intent regarding the key statutory phrase. If Congress, at a later point, either ratified a different administrative construction or otherwise specifically indicated an intent contrary to its intent at the time the amendment was enacted, then those later statements of congressional intent may supersede the intent as originally expressed. On the other hand, if congressional statements and actions suggest an understanding consistent with the initial intent, they will reinforce the weight to be given that intent.
 
 
 70
 The government makes two arguments relevant to the question of later congressional intent. First, it argues that the administrative practice under the Pelly and Packwood-Magnuson Amendments has consistently been that the Secretary determines that "intentional whaling or fishing activities in excess of duly established international quotas" "diminish the effectiveness" of those quotas only "in the absence of any mitigating factors which shift the balance." Brief for federal appellants at 20. Second, it argues that Congress, in the 1978 "wildlife products" amendments to the Pelly Amendment,[18] recognized significant discretion on the part of the Secretary in determining when actions "diminish the effectiveness" of the international programs. Far from supporting the government's position, however, the subsequent legislative history supports the interpretation that the Secretary has a nondiscretionary duty to certify when another country exceeds international fishing limits.
 
 
 71
 To begin with, even assuming that the government's characterization of past Executive practice is accurate (an assumption whose validity we need not resolve and that we therefore do not address[19]), we see no indications that Congress was either aware of or acquiesced in such a practice. In fact, the legislative history of the Packwood-Magnuson Amendment indicates an understanding of the certification process in the context of intentional whaling in excess of IWC quotas that consistently supports the conclusion we reached previously as to congressional intent with respect to the relevant provision of the Pelly Amendment.
 
 
 72
 The Packwood-Magnuson Amendment as it was finally enacted was added to the bill that eventually became law only after the bill had gone through the committee process. See H.R.Rep. No. 96-170, 96th Cong., 1st Sess. (1979) (amendment not included); S.Rep. No. 96-72, 96th Cong., 1st Sess. 6 (1979) (amendment included in original form of (1) applying to all Pelly Amendment certification and (2) 100 percent reduction of fishery allocation in case of such certification). In such a situation, where voting Senators and Representatives do not have pertinent committee reports to inform their understanding of a proposed statute, the statements of the bill's sponsors on the floor of the Congress will be of unusually great significance in determining congressional intent, for the representations made by the sponsors will likely be relied upon by the Congress.
 
 
 73
 The statements made by the sponsors of the Packwood-Magnuson Amendment strongly support the conclusion that intentional whaling in excess of the IWC quotas was intended to trigger certification automatically. On the floor of the Senate, Senator Packwood summarized the projected operation of the proposed amendment:
 
 
 74
 The core of the Packwood-Magnuson amendment is simply that any foreign nation which directly or indirectly conducts whaling operations or allows its nationals to conduct whaling operations or engage in trade in whale products in disregard of the conservation regulations of the International Whaling Commission shall be denied access to the rich fishery resources of our 200-mile zone.
 
 
 75
 * * *
 
 
 76
 * * *
 
 
 77
 * * * This amendment * * * will prohibit those nations which violate the conservation regulations of the International Whaling Commission from fishing within our 200-mile zone. As Senator Magnuson and I had initially drafted it, it would have prohibited them from totally fishing in the zone if they violated the conservation regulations, but it would not have prohibited it until their permit to fish within the zone had to be renewed, and that would be up to a year.
 
 
 78
 Consequently, in working with the House managers we have reached a compromise which says that if any nation that fishes within the 200-mile zone violates the whaling conservation regulations, they will immediately, not having to wait until their permit can be renewed, lose 50 percent of their allocation for fishing within our 200-mile zone. If between that time and the time of the renewal of the permit they have not brought themselves in compliance with the regulations of the International Whaling Commission they will totally lose the right to fish in our 200-mile zone.
 
 
 79
 The reason that this amendment will be so effective is because it is going to force Japan and Russia, which are the two principal violators of the International Whaling Commission regulations, to choose between the continued taking and/or buying of illegal whale meat, to choose between that privilege and the privilege of fishing in our 200-mile zone. The privilege of fishing in our 200-mile zone is an infinitely superior economic privilege and any country in its right mind when forced to the decision between fishing in the 200-mile zone and giving up illegal whaling is going to give up illegal whaling. This amendment would have the effect of forcing that decision, and it is probably the most significant step this country can take toward protecting the remaining whales of the world.
 
 
 80
 125 Cong.Rec. 21742-21743 (1979).
 
 
 81
 Another statement, made by Senator Magnuson, is similar:
 
 
 82
 If a foreign country is certified by the Secretary of Commerce for violating or diminishing the effectiveness of international whaling regulations or for engaging in trade that diminishes the effectiveness of the international regime regulating the taking of whales, then that nation will be denied access to fish in our 200-mile fishery conservation zone. This amendment is a significant addition to the sanctions presently available under the Pelly Amendment (22 U.S.C. Sec. 1978).
 
 
 83
 There are several things that should be pointed out in this regard. First, the Japanese Government recently prohibited the importation of whale products from non-International Whaling Commission member nations. This action of the Japanese should be sincerely commended--it is a significant step forward. However, this does not mean that the Japanese traders should become complacent now or misread the intent of this amendment. If Japan or any other nation imports whale products from IWC member countries and this trade is merely a routing mechanism for whales taken outside international regulation * * * or otherwise diminishes the effectiveness of whale programs described earlier, then this amendment will still be invoked.
 
 
 84
 Id. at 21743. This statement supports the interpretation we suggested above: Certification results from violations of regulations or from other actions which "diminish the effectiveness" of the regulations.
 
 
 85
 On the floor of the House, Representative Murphy, the chairman of the committee responsible for the bill, noted that "with respect to any nation which the Secretary of Commerce has certified as being in violation of the IWC, the Secretary of State is required to immediately reduce the unharvested portion of any allocation to such nation by not less than 50 percent." Id. at 22082-22083. Representative Oberstar, a committee member who had been active in passage of the Amendment, further stated that "[t]he Department of Commerce certifies a nation under the provisions of [the Pelly] amendment when a nation is found to have acted in a manner contrary to international agreements for the protection of a fishery resource." Id. at 22083. These statements clearly do not support a hypothesis that Congress contemplated an administrative practice of discretionary determinations that actions were "diminishing the effectiveness" of international regulations in the face of intentional exceeding of fishing/whaling quotas or that Congress endorsed such a practice in any way.[20] In fact, they plainly support our conclusion that Congress intended that treaty violations automatically trigger such a determination.
 
 
 86
 The government also argues that Congress, in 1978, defined the phrase "diminish the effectiveness" in a manner that supports the government's contention that it is allowed discretion in making such determinations. In the House Report to these amendments, which extended the Pelly Amendment to apply to "trade or taking which diminishes the effectiveness of any international program for endangered or threatened species," 22 U.S.C. Sec. 1978(a)(2),[21] the Committee stated:
 
 
 87
 Paragraph (1) of section 2 would amend [22 U.S.C. Sec. 1978(a) ] to add a new paragraph (2) to such subsection to authorize the President to embargo wildlife products whenever the Secretary of Commerce or the Secretary of the Interior finds that nationals of a foreign country, directly or indirectly, are engaging in trade or taking which diminishes the effectiveness of an international program for endangered or threatened species and the Secretary making such finding certifies such fact to the President. This paragraph makes it clear that the Secretaries' duties are mandatory, once an affirmative finding has been made. When the appropriate Secretary makes such a funding [sic ], he must certify that fact to the President.
 
 
 88
 The nature of any trade or taking which qualifies as diminishing the effectiveness of any international program for endangered or threatened species will depend on the circumstances of each case. In general, however, the trade or taking must be serious enough to warrant the finding that the effectiveness of the international program in question has been diminished. An isolated, individual violation of a convention provision will not ordinarily warrant certification under this section.
 
 
 89
 H.R.Rep. 95-1029, 95th Cong., 2d Sess. 15 (1978).
 
 
 90
 The government contends that this language indicates that Congress intended to give the Secretary discretion to determine that a country that is making "good faith efforts to bring itself into line with major conservation decisions" is not "diminishing the effectiveness" of those decisions. Brief for federal appellants at 14. We do not agree.
 
 
 91
 In assessing the relevance of this description, it is crucial to remember that it applies only to the addition to the Pelly Amendment that addresses international programs for conservation of endangered and threatened species--not to the original fishery-related provision. Although this point may initially appear to be overly formalistic, we are convinced that a closer analysis shows it to be quite important.
 
 
 92
 The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), opened for signature March 2, 1973, [1976] 27 U.S.T. 1087, the international program that the 1978 amendments sought to enforce, see H.R.Rep. No. 95-1029, supra, at 11, operates in a manner entirely different from that of original Pelly Amendment. The fishery programs generally provide for concrete recommendations or actual quotas designating permissible and impermissible fishing (or whaling). CITES, on the other hand, provides for no such generally applicable regulations.
 
 
 93
 Rather, CITES is aimed at trade between nations. Substantively, it requires only import and export permits for trade in living specimens of species covered by the Convention or in products derived from dead specimens (e.g., furs). The standard that member nations are pledged to honor in granting such permits is that the trade not be "detrimental to the survival" of the species in question. Further, the determination is made by each country regarding the issuance or denial of a permit. See Articles III & IV, 27 U.S.T. at 1093-1097. No generally applicable trade or taking quotas are set under CITES. Thus CITES by its very nature allows for significant discretion on the part of the member nations that must implement it. See, e.g., Defenders of Wildlife v. Endangered Species Scientific Authority, 725 F.2d 726 (D.C.Cir.1984) (addressing U.S. regulations for making determination with respect to bobcat exports). In light of this fact, the import of the House Report language becomes clearer: In the CITES context, the Secretary will almost always have to have discretion in making the relevant determination because there are essentially no nondiscretionary standards created under its auspices.[22]
 
 
 94
 In the fishery programs covered by the original Pelly Amendment (including the ICRW), however, there are many standards set that apply to all members: Discretion is vested in the international body rather than in the member nations. In these situations, of which the current case is one, discretion in making certification decisions is not necessary and appears, at least in this precise situation, not to have been intended by Congress. Consequently, we do not believe that this apparent expression of congressional intent with respect to the 1978 amendments rebuts the congressional intent regarding fishing and whaling in excess of internationally set quotas that was expressed in the legislative history of the 1971 and 1979 enactments. It simply confirms our initial conclusion that Congress intended that the Secretary exercise discretion in making some determinations (in contexts other than the one at hand).
 
 
 95
 In sum, we have considered the government's arguments that relate to subsequent congressional intent and we have concluded that Congress did not express an intent to change the meaning of the phrase "diminish the effectiveness" contained in the original Pelly Amendment in the type of context at issue in this case. Thus the conclusion we reached with respect to the original congressional intent regarding that phrase remains intact. To the extent that the subsequent legislative history is relevant, moreover, the evidence, particularly the statements of sponsors Packwood and Magnuson, fully supports our conclusion.
 
 
 96
 2. Must certification result where the Secretary has made a determination that a foreign country is "diminishing the effectiveness" of an international fishery conservation program? The next question we must address is whether, once the Secretary has determined that actions are "diminishing the effectiveness" of an international fishery conservation program, he must certify. The statute provides that when the Secretary determines that actions exist that diminish the effectiveness of a program he shall certify that fact to the President. The mandatory, nondiscretionary overtones of this word are conclusively corroborated by the legislative history of this provision. Language such as the Secretary "must certify," S.Rep. No. 92-582, supra, at 2; 117 Cong.Rec. 47053 (1971) (statement of Sen. Stevens), "would be required to certify," id. at 34751 (statement of Rep. Dingell), and "[is directed] to certify," Pelly House Report at 6, supports the plain meaning interpretation of the statute that the duty to certify, once actions have been determined to "diminish the effectiveness" of an international program, is mandatory and nondiscretionary.
 
 
 97
 In sum, congressional intent with regard to the Pelly Amendment is as follows: Where a foreign nation allows its nationals to fish in excess of recommendations set forth by an international fishery conservation program, it has per se diminished the effectiveness of that program. In such a case the Secretary is mandated to certify the foreign country under the Pelly Amendment. Specifically, where a foreign country's nationals harvest whales in excess of IWC harvest quotas, certification is mandatory and nondiscretionary.
 
 
 98
 C. Application of the Statute to the Instant Case
 
 
 99
 The District Court found, and appellants do not controvert, that Japanese nationals have harvested sperm whales in excess of the harvest quotas set by the IWC (zero for the 1984-1985 season). See American Cetacean Society, supra, 604 F.Supp. at 1404, 1409. Based on this fishing, and on its interpretation of the statute as creating a nondiscretionary duty in the Secretary to certify where a nation allows whaling in excess of IWC quotas, the District Court issued the writ of mandamus requested by the plaintiffs. See id. at 1410-1411.
 
 
 100
 Based on our reading of congressional intent, we agree with the District Court that the Secretary had a nondiscretionary duty in these circumstances to certify Japan. So too do the plaintiffs have a clear right to relief. Finally, no other adequate remedy exists. Thus the legal requirements for issuance of the writ have been properly met.
 
 
 101
 Nor do we believe that the District Court abused its discretion in this instance. See 13th Regional Corp., supra, 654 F.2d at 760. The Japanese intervenor-appellants argue that the relief granted here, which in effect abrogates an agreement entered into by the Executive Branch with a foreign country, was an abuse of the District Court's equitable powers. See brief for Japanese appellants at 35-37. Although we are aware, as was the District Court, of the gravity of its order, we do not believe that it abused its discretion.
 
 
 102
 As we determined above, the executive agreement in question was entered into in violation of the Secretary's statutory mandate. Although it is urged that deference to the Executive is particularly apt and intrusion by the judiciary particularly inapt in the foreign affairs context, it is imperative to remember that the Legislative Branch, by explicit constitutional provision, has the power to regulate foreign commerce. See U.S. Const., Art. I, Sec. 8. And, since the judiciary's role is to declare what the law is when Congress has acted, see Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), we must perform that duty even in this delicate context.[23]IV. CONCLUSION
 
 
 103
 The District Court's decision granting summary judgment in favor of the plaintiff-appellees and ordering the Secretary of Commerce to certify Japan under 22 U.S.C. Sec. 1978(a)(1) is affirmed. Because of the circumstances of this case, the mandate of this court is stayed for 90 days from the date of this opinion.
 
 
 104
 So ordered.
 
 
 105
 OBERDORFER, District Judge (dissenting): With regret and respect I must dissent.
 
 
 106
 I cannot agree that, in the circumstances of this case, the Pelly Amendment, 22 U.S.C. Sec. 1978, should be construed to impose upon the Secretary of Commerce a ministerial duty to certify Japan solely because it is not adhering to an international whaling quota which is not binding on it. The Pelly Amendment, enacted in 1971, provides in pertinent part that
 
 
 107
 [w]hen the Secretary of Commerce determines that nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program, the Secretary of Commerce shall certify such fact to the President.
 
 
 108
 22 U.S.C. Sec. 1978(a)(1). The Packwood-Magnuson Amendment, which became law in 1979, requires the Secretary of State, upon receipt of a certification under the Pelly Amendment, to reduce by 50 percent the catch allowed the certified nation and its nationals in the waters within 200 miles of the coasts of the United States. 16 U.S.C. Sec. 1821(e)(2). Brief reconsideration of the essential facts on which the Secretary relied in applying these statutes in this case will help explain my concerns.
 
 I.
 
 109
 The International Convention for the Regulation of Whaling ("Convention") created an International Whaling Commission ("Commission") with authority to state, but not to enforce, limits or quotas for nations taking whales from the oceans of the world. In 1981, the Commission set what is in effect a zero catch limit for the Western Division Stock of North Pacific sperm whales. To do so, the Commission amended the Schedule which sets quotas or catch limits for various species of whales during defined seasons and in particular areas of the world. The Schedule now provides, among other things, that "[n]o [sperm] whales may be taken from this stock until catch limits ... are established by the Commission." Footnote 1 to Table 3, reprinted in Joint Appendix (J.A.) at 67.
 
 
 110
 Japan entered a timely objection to the 1981 Schedule. See Article V-3 of the Convention, entered into force Nov. 10, 1948, 62 Stat. 1716, T.I.A.S. 1849, reprinted in J.A. at 50; Table 3, 1983 Convention Schedule, J.A. at 67 n. *. By the terms of the Convention, this objection relieved Japan of any legal obligation to honor the 1981 quota. The Commission later agreed that Japan could take 450 sperm whales in the 1982 coastal and season and 400 sperm whales in the 1983 coastal season. See Review of the 34th International Whaling Commission Meeting: Hearing Before the Subcommittee on Human Rights and International Organizations of the House Comm. on Foreign Affairs, 97th Cong., 2d Sess. 19 (1982), reprinted in Appellee's Appendix at G-18. At its annual meeting in June 1984, the Commission declined to amend the Schedule as it applied to sperm whales. As a result, those nations which had not objected to the Schedule will be in violation of the Convention if they take sperm whales before the Commission establishes a new quota. J.A. at 77. Japan, however, did not withdraw its objection and therefore was not obligated under the Convention to observe the zero catch limit. See 1984 Amendments to the Schedule, J.A. at 77 n. *.
 
 
 111
 In 1982, the Commission purported to impose a moratorium on all commercial whaling, effective with the end of the 1985 coastal season and the end of the 1984/85 pelagic whaling season. J.A. at 65. Japan also objected to this moratorium and so is not legally obligated to observe it either. J.A. at 65 n. *. Japan nevertheless anticipated that, notwithstanding its objections and the absence of any obligation under international law to honor either the 1981 quota or the moratorium, it might be subject to certification and consequent sanctions by the United States acting on the authority of the Pelly and Packwood-Magnuson Amendments. Accordingly, Japan commenced negotiations with American officials.[1] On November 13, 1984, Yasushi Murazumi, Charge d' Affairs ad interim of Japan, sent a letter to the Secretary of Commerce proposing a compromise. In that letter, Japan recognized "the need to take measures including the withdrawal of the objection mentioned above in order to avoid a confrontation between our two countries," but requested "an additional period of time for the purpose of minimizing the economic and social hardship of those who are engaged in commercial sperm whaling." J.A. at 78. Assuming that the Secretary had the discretion to determine when certification was appropriate, Japan requested
 
 
 112
 that, as long as Japanese commercial whaling is conducted in a manner as indicated in the arrangement set forth in the Summary of Discussions attached to this letter, you not consider that the whaling will diminish the effectiveness of the Convention or its conservation program and not certify such whaling as provided for in the Pelly Amendment or the Packwood-Magnuson Amendment.
 
 
 113
 J.A. at 79. The Summary of Discussions memorialized negotiations between Dr. John V. Byrne, United States Commissioner to the International Whaling Commission, and Mr. Hiroya Sano, Director-General of the Fisheries Agency of the Japanese Ministry of Agriculture, Forestry and Fisheries. Significantly,
 
 
 114
 [t]he heads of the delegations shared the view that [an arrangement whereby the United States Secretary of Commerce might refrain from "certifying" sperm whaling by Japanese nationals] might be possible, subject to satisfactory resolution of certain details and to approval and implementation by the cognizant authorities of each Government.
 
 J.A. at 80.[2]
 
 115
 The proposed arrangement permitted Japan to take 400 sperm whales during each of the 1984 and 1985 coastal seasons without triggering certification, provided that Japan withdrew, by December 13, 1984, its objection to the 1981 Schedule. J.A. at 81. The agreement also permitted Japan to catch up to 200 sperm whales per season during the 1986 and 1987 coastal whaling seasons, and to continue minke and Bryde's whaling for two years beyond the general moratorium date. In exchange, Japan would withdraw its objection to the Commission moratorium on commercial whaling. The effect of this withdrawal would be that "Japanese commercial coastal whaling will cease following the 1987 coastal season and Japanese commercial pelagic whaling will cease following the 19 86/87 pelagic season...." J.A. at 81.
 
 
 116
 The Secretary of Commerce responded to the letter on the day on which it was sent. He stated:
 
 
 117
 After consulting with the United States Commissioner to the International Whaling Commission (IWC), I have concluded that commercial harvests of whales by Japanese nationals within the limits and under the circumstances set forth in the Summary of Discussions attached to your letter would not diminish the effectiveness of the International Convention for the Regulation of Whaling, 1946, or its conservation program.
 
 
 118
 J.A. at 83. On December 11, 1984, in reliance on the Secretary's promise, made on behalf of the United States, Japan withdrew its objection to the Schedule amendment. J.A. at 106. On April 5, 1985, Japan informed the Secretary that it would withdraw its objection to the moratorium within five days of a decision by this court in favor of the United States.
 
 II.
 
 119
 There is a threshold question which has not been addressed by the majority: does this case present a justiciable question? Although "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962), the justiciability issue is important and should ordinarily be decided before reaching the merits. Cf. Adams v. Vance, 570 F.2d 950, 954 (D.C.Cir.1977). One factor in determining the justiciability of a foreign affairs question is "the possible consequences of judicial action." Baker v. Carr, supra, 369 U.S. at 211-12, 82 S.Ct. at 706-07. Baker v. Carr further warned about "embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217, 82 S.Ct. at 710. Although Congress joins the Executive in setting the agenda for foreign relations, see Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918), "[t]he President alone has the power to speak or listen as a representative of the nation." United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936). Thus, "the President is exclusively responsible" for the "conduct of diplomatic and foreign affairs." Johnson v. Eisentrager, 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950); see also Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948).
 
 
 120
 Yet, the district court's order has added the Judicial Branch's voice to this delicate process. The order, here approved, will in effect require the Secretary to dishonor the United States' commitment, upon which Japan relied in withdrawing its objection to the 1981 quota. Moreover, the district court's order has entangled the judiciary in foreign policy by causing Japan to condition its commitment to honor the moratorium on a favorable decision by this Court.[3]
 
 
 121
 The hazards of such judicial involvement in issues ordinarily reserved for the political departments of our government could make this controversy unsuitable for judicial action. Cf. Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1547 & n. 5 (Tamm, J., dissenting). For present purposes, however, it is not necessary to perform the "discriminating analysis"[4] required to determine whether this case is justiciable. The justiciability issue has serious constitutional implications which make it appropriate to bypass the question and proceed to the merits. See Adams v. Vance, supra, 570 F.2d at 954 n. 7.
 
 
 122
 This is not to say that the factors which call justiciability into question are not relevant here. In my view, these factors heighten the need for forbearance by the courts in the absence of a clear command from Congress. In Adams v. Vance, for example, a panel of this court declined to reach the question of justiciability and proceeded to the merits, emphasizing that:A request for an order directing action by the Secretary of State in foreign affairs plainly constitutes such an intrusion into the core concerns of the executive branch]. Court must beware "ignoring the delicacies of diplomatic negotiation, the inevitable bargaining for the best solution of an international conflict, and the scope which in foreign affairs must be allowed to the President."
 
 
 123
 Id. at 954 (quoting Mitchell v. Laird, 488 F.2d 611, 616 (D.C.Cir.1973)).[5] Adams confirms that we should be particularly hesitant to contradict the Executive's interpretation of a statute relied upon to form an international agreement, unless that interpretation is clearly erroneous. I am not persuaded that the Secretary's interpretation of the Pelly Amendment was clearly erroneous.
 
 III.
 A.
 
 124
 The Pelly Amendment, by its terms, requires the Secretary of Commerce to examine the "manner" and "circumstances" under which foreign nationals are conducting fishing operations and, more important here, to determine whether fishing operations so conducted "diminish the effectiveness" of a fishery conservation program. This language means to me that some deviations from Commission quotas must be certified, but others need not be if the Secretary determines that the manner and circumstances of the fishing operations would not diminish the effectiveness of a program.
 
 
 125
 The majority concedes that "the critical statutory phrase, 'diminish the effectiveness,' is not defined in the statute." Majority Opinion at 436. To bridge the gap between what the statute actually says and a clear requirement to certify solely for violation of a quota, the Court turns to "traditional tools of statutory construction."[6]
 
 
 126
 The Court's analysis of the legislative history of the relevant statutes is an impressive, but far from conclusive, demonstration that congressional sponsors of the Pelly Amendment intended that the Secretary certify any deviation by a nation or its nationals from a Commission quota. For example, the legislative history suggests that Congress intended the Secretary to certify nations that "flaunt," "ignore," or flagrantly violate international quotas. The use of such language strongly implies that Congress understood the Pelly Amendment as giving the Secretary the discretion to distinguish between an egregious violation warranting certification and an accommodation which bent but did not break the program. Here, Japan has not simply "flaunted" the Convention quota--to the contrary, it has acknowledged the need to withdraw its objections to the 1981 Schedule Amendment. See J.A. at 78. Accordingly, Japan has negotiated an arrangement designed to accommodate its needs with the program articulated by the Convention. Regardless of whether the Secretary must certify nations that continue to violate quotas without entering into any agreement with the United States--a question which we need not decide--the legislative history does not so plainly alter the language of the statute as to leave the Secretary no discretion to decide whether Japan's stance vis a vis the 1981 quota and the moratorium "diminishes the effectiveness" of the Convention.
 
 
 127
 Nevertheless, if this statute involved domestic affairs, I might be able to endorse a decision based on this secondary evidence of congressional intent. For as the majority points out, "[t]he requirement that a duty be 'clearly defined' to warrant issuance of a writ does not rule out mandamus actions in situations where the interpretation of the controlling statute is in doubt." 13th Regional Corp. v. U.S. Dept. of Interior, 654 F.2d 758, 760 (D.C.Cir.1980). But the mandamus cases that look to secondary evidence to resolve doubts about Congress' intent[7] do not involve "international relations."[8] Moreover, it is not a satisfactory answer to say that the Executive Branch and the Japanese could have read the same legislative history materials and reached the same conclusion reached by the majority and the court below. Nor would it have been appropriate to expect either Japan or the Executive Branch to seek a declaratory judgment about the Secretary's authority to enter into this agreement. See Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). The international relations implications of this case persuade me that, in the absence of a congressional mandate, clear on its face, we should neither find nor enforce a ministerial duty.
 
 B.
 
 128
 Even assuming that the Pelly Amendment can be interpreted by use of legislative history materials to impose an obligation to act that is both "peremptory, and clearly defined," it is important to recognize that "[t]he court has additional authority to refrain from issuing a writ, for the 'exercise of the power of mandamus is a matter committed to the sound discretion of the trial court.' " 13th Regional Corp., supra, 654 F.2d at 760 (quoting Cartier v. Secretary of State, 506 F.2d 191, 199 (D.C.Cir.1974), cert. denied, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975)). Because "mandamus is itself governed by equitable considerations and is to be granted only in the exercise of sound discretion," Whitehouse v. Illinois Central R.R. Co., 349 U.S. 366, 373, 75 S.Ct. 845, 850, 99 L.Ed. 1155 (1955), "the case must be found by a court to be clear and compelling on both legal and equitable grounds for a writ to issue." 13th Regional Corp., supra, 654 F.2d at 760 (emphasis added); see id. at 762-63. Neither the majority nor the court below have addressed these equitable considerations.
 
 
 129
 In my view, the equities (including the necessity of avoiding the thorny constitutional question related to justiciability) weigh heavily in favor of the Secretary. The Supreme Court has recently reminded us that "[g]reat nations, like great men, should keep their word." FPC v. Tuscarora Indian Nation, 362 U.S. 99, 142, 80 S.Ct. 543, 567, 4 L.Ed.2d 584 (1960) (Black, J., dissenting) (quoted with approval in CIA v. Sims, --- U.S. ----, 105 S.Ct. 1881, 1891 n. 20, 85 L.Ed.2d 173 (1985)). The ultimate equity here is that the United States, speaking through the Secretary of Commerce, has given its word in apparent reliance on the language of an Act of Congress. Japan has made a reciprocal promise in reliance on the same language and the Secretary's interpretation of it. In these circumstances, I would not approve an order directing the Secretary to certify Japan.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 Intervenor-appellants Japan Fisheries Association and Japan Whaling Association argue that certification and the imposition of sanctions pursuant to such certification are violations of international law when applied to a validly objecting member insofar as the Convention requirements are not effective with respect to such a member. We disagree. There is no prohibition in the Convention against member nations acting unilaterally to force an objecting member (or nonmember) to comply with the Convention's regulations, even where those regulations are not binding on the member (or nonmember) under the terms of the Convention itself
 
 
 [2]
 The idea behind this provision was that a foreign country in this position will choose the less damaging economic alternative, which will usually be giving up the proscribed fishing rather than the U.S. fish products export market. As the House reported noted,
 In the case of Atlantic Salmon, Danish exports to the United States totalled 54,365 pounds in 1970 worth $63,844.00. Imports of all Danish fish products totalled 31,656,00 lbs. valued at $10,543,298. The impact of lossing [sic ] a 10 million dollar market as opposed to a 63 thousand dollar market is obvious.
 House Pelly Report at 7.
 
 
 [3]
 In 1978, in response to the signing of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), opened for signature March 3, 1973, [1976] 27 U.S.T. 1087, T.I.A.S. No. 8249, Congress amended the Pelly Amendment by adding a new certification section:
 When the Secretary of Commerce or the Secretary of the Interior finds that nationals of a foreign country, directly or indirectly, are engaging in trade or taking which diminishes the effectiveness of any international program for endangered or threatened species, the Secretary making such finding shall certify such fact to the President.
 22 U.S.C. Sec. 1978(a)(2). Further, Sec. 1978(a)(4) was amended to authorize the President to "prohibit the bringing or the importation into the United States of * * * wildlife products * * * from the offending country" in the case of such certification. The congressional notification provisions also were applied to these situations. See 22 U.S.C. Sec. 1978(b).
 
 
 [4]
 The Packwood-Magnuson Amendment provisions regarding imposition of the sanction are:
 (B) If the Secretary issues a certification with respect to any foreign country, then each [U.S. fishing allocation] that--
 (i) is in effect for that foreign country on the date of issuance; or
 (ii) is not in effect on such date but would, without regard to this paragraph, be made to the foreign country within the remedial period [the one year following certification];
 shall be reduced by the Secretary of State, in consultation with the Secretary, by not less than 50 percent.
 (C) The following apply for purposes of administering subparagraph (B) with respect to any foreign country:
 (i) If on the date of certification, the foreign country has harvested a portion, but not all, of the quantity of fish specified under any allocation, the reduction under subparagraph (B) for that allocation shall be applied with respect to the quantity not harvested as of such date.
 (ii) If the Secretary notified the Secretary of State that it is not likely that the certification of the foreign country will be terminated under section 1978(d) of title 22 before the close of the period for which an allocation is applicable or before the close of the remedial period (whichever close first occurs) the Secretary of State, in consultation with the Secretary, shall reallocate any portion of any reduction made under subparagraph (B) among one or more foreign countries for which no certification is in effect.
 (iii) If the certification is terminated under such section 1978(d) of title 22 during the remedial period, the Secretary of State shall return to the foreign country that portion of any allocation reduced under subparagraph (B) that was not reallocated under clause (ii); unless the harvesting of the fish covered by the allocation is otherwise prohibited under this chapter.
 (iv) The Secretary may refund or credit, by reason of reduction of any allocation under this paragraph, any fee paid [by the foreign country for its fishing permits].
 (D) If the certification of a foreign country is not terminated under section 1978(d) of title 22 before the close of the last day of the remedial period, the Secretary of State--
 (i) with respect to any allocation made to that country and in effect (as reduced under subparagraph (B)) on such last day, shall rescind, effective on and after the day after such last day, any unharvested portion of such allocation; and
 (ii) may not thereafter make any allocation to that country * * * until the certification is terminated.
 16 U.S.C. Sec. 1821(e)(2).
 
 
 [5]
 As originally introduced, the bill would have applied to all countries certified under the Pelly Amendment with respect to "living marine resources" and would have required 100% prohibition of U.S. fishing allocations. See S.Rep. No. 96-72, 96th Cong., 1st Sess. 6 (1979). See also 125 Cong.Rec. 21743 (1979) (statement of Sen. Packwood); id. at 22082-22083 (statement of Rep. Murphy). (Under the final bill, a 50% reduction is required; a greater reduction is possible at the discretion of the Secretary of State.) The original bill, however, would have cut the allocation only as of the expiration of the country's current fishing permit. See id. at 22083 (statement of Rep. Murphy)
 
 
 [6]
 It also explicitly preserved the option of imposing the Pelly Amendment sanction in addition to the Packwood-Magnuson sanction. See 16 U.S.C. Sec. 1821(e)(2)(A)(i). See also 125 Cong.Rec. 21743 (1979) (statement of Sen. Magnuson) "This amendment is a significant addition to the sanctions presently available under the Pelly Amendment * * *."); id. at 22084 (statement of Rep. Oberstar) ("The legislation before us does not deprive the President of the authority to invoke the discretionary penalty; it adds an additional penalty that is automatic.")
 
 
 [7]
 The District Court had previously denied such a stay. See American Cetacean Society v. Baldridge, 604 F.Supp. 1411 (1985)
 
 
 [8]
 See Fed.R.Civ.P. 56(c) ("[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.")
 
 
 [9]
 See 28 U.S.C. Sec. 1361 (1982) ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.")
 
 
 [10]
 Even where mandamus is legally appropriate, a District Court may exercise its equitable discretion and deny the writ if issuance is inappropriate for other reasons. See, e.g., 13th Regional Corp. v. U.S. Dept. of Interior, 654 F.2d 758, 760, 762-763 (D.C.Cir.1980) (delay of four years in seeking writ reasonable basis for denying it). See also Cartier v. Secretary of State, 506 F.2d 191, 199 (D.C.Cir.1974), cert. denied, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975)
 
 
 [11]
 22 U.S.C. Sec. 1978(d) provides:
 After making a certification to the President under subsection (a) of this section, the Secretary of Commerce or the Secretary of the Interior, as the case may be, shall periodically review the activities of the nationals of the offending country to determine if the reasons for which the certification was made no longer prevail. Upon determining that such reasons no longer prevail, the Secretary concerned shall terminate the certification and publish notice thereof, together with a statement of the facts on which such determination is based, in the Federal Register.
 
 
 [12]
 There are actually two Senate Reports, both issued the same day, that are relevant to the Pelly Amendment. The first, S.Rep. No. 92-582, accompanied S. 2191. S. 2191, however, was amended in committee to the exact language of H.R. 3304, the bill that the Senate eventually passed as the Pelly Amendment. The second, S.Rep. No. 92-583, 92d Cong., 1st Sess. (1971), accompanied H.R. 3304. S.Rep. 92-582 contains substantive discussion of S. 2191. S.Rep. 92-583 merely reported H.R. 3304 without recommendation or amendment. Since both bills were the same with respect to the provisions that concern us, we regard S.Rep. 92-582 as the relevant report
 
 
 [13]
 Representative Pelly stated that the provision would extend to "flagrant violations" other than salmon fishing and that the provision would prevent American benefits (access to the American import market) from accruing to foreign countries that "flount [sic ] international conservation measures." See 117 Cong.Rec. 34752 (1971). These statements do indicate that flagrant actions in excess of internationally set regulations would result in certification, but do not indicate that non-flagrant actions would not. Consequently, they are not directly relevant to the issue at hand
 
 
 [14]
 16 U.S.C. Sec. 955(c) provides in relevant part:
 [U]pon the promulgation of any [domestic regulations implementing the recommendations of the Inter-American Tropical Tuna Commission] the Secretary of Commerce shall promulgate additional regulations, with the concurrence of the Secretary of State, which shall become effective simultaneously with the application of the [domestic regulations] (1) to prohibit the entry into the United States, from any country when the vessels of such country are being used in the conduct of fishing operations in the regulatory area in such manner or in such circumstances as would tend to diminish the effectiveness of the conservation recommendations of the commission, of fish in any form of those species which are subject to regulation pursuant to a recommendation of the commission and which were taken from the regulatory area; and (2) to prohibit entry into the United States, from any country, of fish in any form of those species which are subject to regulation pursuant to a recommendation of the commission and which were taken from the regulatory area by vessels other than those of such country in such manner or in such circumstances as would tend to diminish the effectiveness of the conservation recommendations of the commission. * * *
 
 
 [15]
 The original bill evidently endowed the Secretary of the Interior rather than the Secretary of Commerce with the responsibility for executing this statutory provision
 
 
 [16]
 We find no evidence of an interpretation of the 1962 amendments contrary to that expressed in their legislative history. No cases interpreting that statutory section were apparently decided. The Secretary did promulgate implementing regulations, see, e.g., 50 C.F.R. Sec. 281.5 (1984), but those regulations were consistent with the statement in the Senate Report
 
 
 [17]
 The 1962 amendments also provided:
 In the case of repeated and flagrant fishing operations in the regulatory area by the vessels of any country which seriously threaten the achievement of the objectives of the commission's recommendations, the Secretary of Commerce, with the concurrence of the Secretary of State, may, in his discretion, also prohibit the entry from such country of such other species of tuna, in any form, as may be under investigation by the commission and which were taken in the regulatory area. * * *
 16 U.S.C. Sec. 955(c) (emphasis added). Thus these amendments created a bipartite scheme for enforcing the tuna treaties. First, failure to implement or enforce the treaty recommendations would result in prohibition of imports of a particular tuna species from the offending country. Second, particularly serious violations of the treaty recommendations might, at the discretion of the Secretary of Commerce, result in prohibition of importation of all protected tuna species taken from the regulated area.
 Given this bipartite scheme, the use of the "diminish the effectiveness" language in the Pelly Amendment seriously undermines two additional arguments made by the appellants. First, the "diminish the effectiveness" provision clearly did not apply only to flagrant "violations." See brief of Japanese appellants at 19-20. Another provision, with a greater potential sanction, was of such limited applicability. Thus such seriousness was not necessary for actions to qualify as "tending to diminish the effectiveness" of the Commission's recommendations.
 Second, the "diminish the effectiveness" provision cited the commission's recommendations themselves, as opposed to the more serious provision of the 1962 amendments, which referred to achievement of the objectives of those recommendations. Thus the "diminish the effectiveness" provision centered on enforcement of the recommendations. The latter provision, on the other hand, was aimed at larger activities with potential for undermining the entire international program and its objectives. Compare brief for federal appellants at 27-28 (focusing on overall program objectives in Pelly Amendment context). In the 1962 tuna amendments, therefore, fishing in excess of the international body's recommendations was understood to be per se an action "tending to diminish the effectiveness" of those recommendations.
 
 
 [18]
 See note 3 supra
 
 
 [19]
 We note simply that the parties' characterizations of this practice differ and that the record does not conclusively show what that practice has been. Any disagreement on this point does not present a genuine issue of material fact because, as we conclude, even if the government could show a consistent practice supporting its interpretation, there are no indications that it was acknowledged, let alone accepted, by Congress
 
 
 [20]
 There are statements by one Congressman that the government cites in support of its argument that discretion in the "diminishing the effectiveness" determination was intended. See 125 Cong.Rec. 22083 (1979) (statement of Rep. Breaux) ("I trust that the Secretary of Commerce will be especially careful to examine all the facts surrounding a possible certification if this law is enacted since a certification from this point on can have disasterous [sic ] effects on our U.S. fishing industry."); Hearings at 314-315, JA 210-211 (statement of Rep. Breaux) ("I understand under the Pelly amendment, as it exists, there are really two areas in which there are optional actions that can be taken by the administration. First, in certifying that a country is in violation of some international agreement, and there is a lot of flexibility in that certification[,] and, second, after a nation is certified, there is still discretion in determining whether a ban on imports of that country's products will in fact be imposed against that country. Therefore, under Pelly we have two discretionary features, whereas in the Packwood amendment, you are really taking all of the discretionary features and putting them into their first category which is the certification of a nation being in violation of an international agreement."); id. at 317, JA 213 (statement of Rep. Breaux) ("The Secretary has the discretion in making a certification decision.")
 We are not persuaded that these isolated statements by one Congressman rebut the numerous statements of others to the opposite effect. Further, we note that the one statement on the floor of the House is ambiguous; it could mean simply that the Secretary should be sure of his facts before certifying a violation. We also note that the same Congressman made contrary statements at the same Hearings as those cited by the government. See Hearings at 312, JA 208 (statement of Rep. Breaux) ("The [Packwood] amendment would require the Secretary of Commerce to deny fishing permits to nationals of those foreign nations which were found to be in contravention of an international conservation agreement, to which the United States was a party."); id. at 323, JA 204 (statement of Rep. Breaux) ("[A]ctually what we are talking about under the Pelly amendment is a two-stage process. First, if a country is violating the terms of an international treaty, the Secretary of Commerce has to certify that he is doing that, and that is not a discretionary thing.").
 
 
 [21]
 See note 3 supra
 
 
 [22]
 The lone nondiscretionary standard is that there be the required permits. All other requirements necessitate exercise of discretion
 
 
 [23]
 The Japanese appellants raise two additional arguments. First, they contend that the Secretary was required to promulgate rules regarding his interpretation of the governing statutory provision. Given that the issue here was one of congressional intent, however, whether or not the Secretary has promulgated interpretive rules is irrelevant. See also SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)
 Second, they contend that imposition of the Packwood-Magnuson sanction deprives them of a property right (the fishing allocation granted by 16 U.S.C. Sec. 1821(e)(1)) without due process and without a hearing "on the record" provided by the Administrative Procedure Act. 5 U.S.C. Sec. 556(d) (1982). These claims are also without merit. The organic statutes here provide no opportunity for a hearing at all, let alone a hearing on the record. Consequently, Sec. 556(d) does not apply. See, e.g., United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 757, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453 (1972). Further, with respect to the due process claim, even assuming that applying the Packwood-Magnuson sanction would deprive these appellants of property rights, we conclude that, in the particular circumstances of this case, they have been afforded adequate due process: The underlying facts of the case are not at issue, see American Cetacean Society v. Baldridge [sic ], 604 F.Supp. 1398, 1399, 1404, 1409 (D.D.C.1985), and these appellants have participated in these proceedings, in which the legal issues have been fully briefed and argued.
 
 
 [1]
 This suit was filed on November 8, 1984, about three weeks after the negotiations commenced
 
 
 [2]
 There is no indication that the parties originally considered the term "cognizant authorities" to include the Judicial Branch of the United States government
 
 
 [3]
 Cf. note 2 supra
 
 
 [4]
 Baker v. Carr, supra, 369 U.S. at 211, 82 S.Ct. at 707
 
 
 [5]
 The Adams court made this statement in the context of an expedited appeal from a preliminary injunction, and its holding does not of its own force preclude a decision that the Secretary has a statutory duty enforceable by mandamus. Cf. Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1521 n. 81 (D.C.Cir.1984) (en banc)
 
 
 [6]
 Chevron, U.S.A. v. NRDC, --- U.S. ----, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984)
 
 
 [7]
 See Council of and for the Blind of Delaware County v. Regan, 709 F.2d 1521 (D.C.Cir.1983) (en banc); 13th Regional Corp., supra. Similarly, the remaining cases cited by the majority for its theory of legislative interpretation do not implicate foreign affairs. See Chemical Manufacturers Ass'n v. NRDC, --- U.S. ----, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); Chevron, U.S.A., Inc. v. NRDC, --- U.S. ----, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); American Methyl Corp. v. EPA, 749 F.2d 826 (D.C.Cir.1984); State of Montana v. Clark, 749 F.2d 740 (D.C.Cir.1984); Rettig v. Pension Benefit Guaranty Corp., 744 F.2d 133 (D.C.Cir.1984)
 
 
 [8]
 See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936)